UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>     Plaintiff,<br><br> v.<br><br>MATTHEW PURSE,<br><br>     Defendant. | CASE NO. 1:21-CR-00512-PLF<br><br>**Honorable Paul L. Friedman**<br>**United States District Judge**<br><br>**(Oral Argument Requested)** |

**MATTHEW PURSE'S MOTION TO DISMISS THE INDICTMENT**

Stephen G. Larson (DC Bar No. 1046780)
Hilary Potashner (Admitted *pro hac vice)*
LARSON LLP
555 S. Flower Street
Suite 4400
Los Angeles, CA 90071
Tel:  (213) 436-4888
Fax: (213) 623-2000
Email: slarson@larsonllp.com
Email:  hpotashner@larsonllp.com

## <u>TABLE OF CONTENTS</u>

**Page**

I.    INTRODUCTION ................................................................................................1

II.   RELEVANT ALLEGATIONS BY THE GOVERNMENT ...............................3

III.  LEGAL STANDARD...........................................................................................4

IV.   ARGUMENT ......................................................................................................5

     A.   Count One for Felony Obstruction of an Official Proceeding Must Be
         Dismissed Because the Statute Is Unconstitutionally Vague and Because
         Mr. Purse Did Not Disrupt an Official Proceeding...................................5

         1.   Section 1512(c)(2) Only Prohibits Evidence Tampering, which Mr.
             Purse Is Not Alleged to Have Engaged in ...................................6

             a.   The Certification of the Electoral College Vote Is Not an
                  "Official Proceeding" Because It Does Not Involve the
                  Presentation of Evidence to Congress...............................7

             b.   Section 1512(c)(2) Only Prohibits Obstructing an Official
                  Proceeding Through Actions with Respect to Documents,
                  Records, or Similar Documentary Evidence................................10

                (i)    The Text of the Statute Suggests that Subsection
                     (c)(2) Is Limited by the Conduct Prohibited in
                     Subsection (c)(1)..............................................11

                (ii)   The Statutory Context Does Not Support Giving
                     Subsection (c)(2) a Scope Broader Than (c)(1) ...............13

                  (iii)  The Historical Development of Section 1512
                     Supports a Narrow Interpretation of Subsection
                     (c)(2) ............................................................14

                (iv)   The Legislative History of Section 1512 Also
                     Supports a Narrow Interpretation of Subsection
                     (c)(2) ............................................................15

                (v)    Even If Two Interpretations of the Statute Are
                     Plausible, the Rule of Lenity Applies ...............................16

              2.   Mr. Purse Could Not Have Obstructed the Certification of the
              Electoral College Vote as a Matter of Law Because the
              Government Concedes that He Entered the Capitol Building After
              the Session Was Already Suspended and Only Observed While
              Inside for a Few Minutes ...........................................................17

             3.   The Term "Corruptly" Is Unconstitutionally Vague as Applied to
             Mr. Purse and in Any Event, There Is No Evidence that Mr. Purse
              Intended to Disrupt the Certification of the Electoral College Vote .........18

     B.   Counts Two and Three Must Be Dismissed Because the Government Has
         Not Alleged Any Facts Indicating that Mr. Purse Knowingly Entered a
          Restricted Building or Grounds ..........................................................22

1.      The Term "Restricted Area" Is Unconstitutionally Vague as
Applied to Mr. Purse and Regardless the Government Has Not
Sufficiently Alleged that the Capitol Building Was a Restricted
Area ........................................................................................................... 22

2.      Even if the Capitol Building Were a Restricted Area, the
Government Has Not Alleged Sufficient Facts Indicating Mr.
Purse Knew That It Was a Restricted Area When He Allegedly
Entered the Capitol Building ................................................................... 24

C.      Counts Three, Four, and Five Must Be Dismissed Because, Based on the
Government's Allegations, Mr. Purse Did Not Violate These Statutes as a
Matter of Law ........................................................................................................ 26

1.      There Are No Allegations That Mr. Purse Engaged in Disorderly
or Disruptive Conduct, nor That He Demonstrated, Picketed, or
Paraded in the Capitol Building .............................................................. 27

2.      There Are No Allegations That Mr. Purse Intended To Do
Anything Other Than Livestream the Protest on His Website While
in the Capitol Building ............................................................................. 27

V.      CONCLUSION ....................................................................................................... 28

## TABLE OF AUTHORITIES

**Page (s)**

### FEDERAL CASES

*Begay v. United States,*
   553 U.S. 137 (2008)..................................................................................................12, 13

*Cartwright v. Maynard,*
   822 F.2d 1477, 1489 (10th Cir.1987) ..................................................................................20

*Kolender v. Lawson,*
   461 U.S. 352 (1983).................................................................................................................18

*Leocal v. Ashcroft,*
   543 U.S. 1 (2004).....................................................................................................................11

*Reiter v. Sonotone Corp.,*
   442 U.S. 330 (1979)...............................................................................................................11

*Robinson v. Shell Oil Co.,*
   519 U.S. 337 (1997)..................................................................................................................6

*United States v. Aguilar,*
   515 U.S. 593 (1995)................................................................................................................17

*United States v. Ballestas,*
   795 F.3d 138, 149 (D.C. Cir. 2015) .......................................................................................5

*United States v. Barnes,*
   481 F. Supp. 3d 15 (D.D.C. 2020) .........................................................................................4

*United States v. Bursey,*
   416 F.3d 301 (4th Cir. 2005) ................................................................................................25

*United States v. Coppin,*
   569 F. App'x 326, 334 (5th Cir. 2014.................................................................................21

*United States v. Davis,*
   139 S. Ct. 2319 (2019)...........................................................................................................18

*United States v. Delgado,*
   984 F.3d 435 (5th Cir. 2021) ...............................................................................................20

*United States v. Ermoian,*
   752 F.3d 1165 (9th Cir. 2013) ........................................................................................7, 8, 9

*United States v. Eshetu,*
   863 F.3d 946, 952 (D.C. Cir. 2017) ............................................................4

*United States v. Fischer,*
   2022 WL 782413 (D.D.C. Mar. 15, 2022) .............................................10

*United States v. Gordon,*
   710 F.3d 1124 (10th Cir. 2013) ...........................................................21

*United States v. Granderson,*
   511 U.S. 39 (1994) ...............................................................................6

*United States v. Kanchanalak,*
   37 F. Supp. 2d 1 (D.D.C. 1999) .......................................................19, 20

*\*United States v. Miller,*
   No. 21-cr-00119 (CJN), Dkt. No. 72 (D.D.C. Mar. 7, 2022)  ........................ *passim*

*United States v. Naik,*
   2020 WL 534539 (D.D.C. Feb. 2, 2020) ..............................................5

*United States v. Nitschke,*
   843 F. Supp. 2d 4 (D.D.C. 2011) ......................................................5

*United States v. Phillips,*
   583 F.3d 1261, 1263 (10th Cir. 2009) ................................................21

*\*United States v. Poindexter,*
   951 F.2d 369 (D.C. Cir. 1991) ....................................................18, 19, 20

*\*United States v. Ramos,*
   537 F.3d 439 (5th Cir. 2008) .........................................................8, 9

*United States v. Reich,*
   479 F.3d 179, 185 (2d Cir. 2007 .....................................................17

*\*United States v. Ring,*
   628 F. Supp. 2d 195 (D.D.C. 2009) ................................................17

*United States v. Villanueva-Sotelo,*
   515 F.3d 1234 (D.C. Cir. 2008) ......................................................6

*United States v. Yakou,*
   428 F.3d 241 (D.C. Cir. 2005) .......................................................4

*United States v. Young,*
   916 F.3d 368 (4th Cir. 2019) ..........................................................9

*Yates v. United States,*
   574 U.S. 528 (2015) ..........................................................................15

## FEDERAL STATUTES

*2* U.S.C.
    § 1961(a) ......................................................................................................25

18 U.S.C.
    § 924(e)(2)(B) .............................................................................................12
    § 1505 ....................................................................................................18, 19
    § 1512(a) .....................................................................................................14
    § 1512(a)(2)(B .............................................................................................15
    § 1512(b) ...............................................................................................14, 15
    § 1512(c) ...............................................................................................*passim*
    § 1512(c)(2) ..........................................................................................*passim*
    § 1515(a)(1)(B) .............................................................................................7
    § 1515(a)(1)(C) .............................................................................................7
    § 1515(b) ...............................................................................................19, 20
    § 1752(a)(1) ..........................................................................................24, 25
    § 1752(a)(2) ..........................................................................................22, 26
    § 1752(c)(1) ..........................................................................................11, 22
    § 3056(d) ....................................................................................................23
    § 3056(e)(1) .................................................................................................23

40 U.S.C.
    § 5104(e)(2)(D) ...........................................................................................26
    § 5104(e)(2)(G) ...........................................................................................26

Armed Career Criminal Act ................................................................................12

Sarbanes–Oxley Act of 2002 ........................................................................8, 15

## Other Authorities

Fed. R. Crim. P. 12(b)(3)(B)(iii), (v) ................................................................1, 4

H.R. REP. 112-9, 2012 U.S.C.C.A.N. 263 (Feb. 11, 2011) ...............................23

*https://www.justice.gov/archives/jm/criminal-resource-manual-1729-protection-*
    *government-processes-tampering-victims-witnesses-or* ..........................................9

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

Defendant Matthew Purse, by and through his attorneys of record, hereby moves this Court to dismiss the Indictment filed by the government on August 19, 2021 (Doc. No. 9) pursuant to Federal Rule of Criminal Procedure 12(b).  For the reasons discussed below, each of the counts in the Indictment fail to state an offense against Mr. Purse.

## I.      <u>INTRODUCTION</u>

Matthew Purse routinely videotapes political protests and rallies of national interest and livestreams them to his website.  On January 6, 2021, Mr. Purse is alleged to have done just that—after a large group forced their way into the Capitol Building to protest Congress's Certification of the Electoral College vote, Mr. Purse entered the Capitol Building, spent four minutes videotaping the crowd, and then attempted to leave the building.

To be clear, the government <u>does not, and cannot contend Mr. Purse *participated* in the protest</u> during his brief time in the Capitol Building—there are no allegations that he forcibly entered the building, that he had any hostile interactions with Capitol Police or any government employee, that he broke or damaged any property, that he chanted, screamed or yelled, or that he was otherwise an active participant in the protest in any way while inside the building. Nonetheless, the government contends that Mr. Purse's act of spending thirteen minutes in the Capitol Building, observing and documenting the protestors, justifies charging him with a felony and four misdemeanors.

The Court should recognize the Indictment for what it is, an improper attempt to unduly criminalize Mr. Purse's behavior based on the unrelated conduct of others.  However, it is Mr. Purse's actions alone which are determinative to the charges being asserted against him, and his alleged actions simply do not give rise to criminal liability as a matter of law.

First, even if Mr. Purse did enter the Capitol Building, this had no impact on the Certification of the Electoral College vote—the government contends that Mr. Purse entered the building after the joint Congressional session had already been suspended, and that he left while the protest was still ongoing.  Thus, the thirteen total minutes that Mr. Purse is alleged to have spent in the Capitol Building (doing nothing more than observing the protest) had no conceivable impact on Congressional business.  Moreover, even if Mr. Purse's conduct could somehow be construed as impeding the Certification of the Electoral College vote, he still could not have obstructed an official proceeding in violation of 18 U.S.C. Section 1512(c)(2) because this statute only prohibits individuals from evidence tampering, which Mr. Purse is not alleged to have engaged in.

Second, the government has not alleged any facts which even remotely suggest that Mr. Purse had any motive for entering the Capitol Building other than to livestream the protest on his website.  Accordingly, Mr. Purse lacked the intent required to be criminally liable under any of the statutes that Mr. Purse is being charged with violating.

Third, Mr. Purse could not have violated Section 1752 because the Capitol Building was not a "restricted area" as defined by the statute, and even if it were, Mr. Purse could not have known that it was restricted at the time he entered the building because Congress and Vice-President Pence had already evacuated nearly forty minutes before he entered the building.  Although it has subsequently been reported that Vice-President Pence remained in the Capitol in a secure area, this was not widely publicized and Mr. Purse could not have known this at the time he is alleged to have entered the Capitol building.

In sum, Mr. Purse's alleged actions, even if true, could not give rise to criminal liability as a matter of law, and thus, Mr. Purse respectfully requests that the Court dismiss the Indictment in its entirety.

II.      **RELEVANT ALLEGATIONS BY THE GOVERNMENT**[1]

Mr. Purse owns and operates a website which is used primarily for livestreaming newsworthy events.  (Doc. 2-1 at p. 2 n. 1).  On January 6, 2021, at approximately 1:00 p.m., a joint session of the U.S. Congress convened at the U.S. Capitol Building for the Certification of the Electoral College vote.  (*Id.* at p. 1).  The government currently alleges that Vice President Pence and Vice President-Elect Harris were both in attendance for this session.[2]  (*Id.*)

Shortly after the session started, a large group gathered outside the Capitol Building. (*Id.*)  The U.S. Capitol Police, who are responsible for securing the Capitol Building, attempted to keep the crowd away from the building by having officers present and by placing temporary and permanent barricades around the exterior of the U.S. Capitol Building.  (*Id.*).  The Capitol Police's efforts were unsuccessful and at around 2:00 p.m., individuals from the crowd forced entry into the U.S. Capitol Building by "by breaking windows and by assaulting members of the U.S. Capitol Police, as others in the crowd encouraged and assisted those acts."  (*Id.*)  Shortly thereafter, approximately 2:20 p.m., members of the U.S. House of Representatives and U.S. Senate, including Vice President Pence, evacuated their chambers.  (*Id.*)  As a result, the joint session on the Certification of the Electoral College vote was suspended until approximately 8:00 p.m.  (*Id.*).  According to the government, Vice President Pence remained in the Capitol Building in an undisclosed location throughout the afternoon.  (*Id.*).

---

[1] Defendant hereby summarizes the allegations contained in the Indictment and Statement of Facts attached to the Criminal Complaint filed by the government on June 18, 2021 (Doc. 2), as is required for purposes of this motion.  Should the Court decline to grant this motion in whole or in part, Defendant reserves the right to contest all charges and factual allegations at all future proceedings.

[2] Based on an exchange with the government, the defense anticipates that the government will withdraw its contentions that Vice President-Elect Harris was in attendance during the Certification of the Electoral College vote.

At approximately 2:59 p.m., Mr. Purse entered the Capitol Building holding a video camera.  (*Id.* at p. 3).  He was wearing protective gear with numerous patches on this clothing indicating that he was with the Press.  (*Id.* at p. 2).  Mr. Purse proceeded to the Rotunda, where he "stood off to the side, observing" while recording the protestors.  (*Id.* at pp. 3-4).  At approximately 3:03 p.m., the crowd became more volatile and Mr. Purse attempted to exit the building.  (*Id.* at p. 4).  He crossed the room, exited the Rotunda, and left the building at approximately 3:12 p.m.  In total, Mr. Purse is accused of being in the Capitol Building for thirteen minutes.

### III.  <u>LEGAL STANDARD</u>

"Rule 12(b) of the Federal Rules of Criminal Procedure provides that '[a] party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial of the general issue.'"  *United States v. Yakou*, 428 F.3d 241, 246 (D.C. Cir. 2005).  "The 'general issue' has been defined as "evidence relevant to the question of guilt or innocence.'"  *Id.*  As such, Rule 12(b) allows a defendant may move to dismiss the pleadings on the basis of a "defect in the indictment or information," including a "lack of specificity" and a "failure to state an offense."  Fed. R. Crim. P. 12(b)(3)(B)(iii), (v).  "'The defense of failure of an indictment to charge an offense includes the claim that the statute apparently creating the offense is unconstitutional.'"  *United States v. Barnes*, 481 F. Supp. 3d 15, 20 (D.D.C. 2020) (citing *United States v. Eshetu*, 863 F.3d 946, 952 (D.C. Cir. 2017), *vacated on other grounds* 898 F.3d 36 (D.C. Cir. 2018)).

The District Court may also dismiss an indictment on "sufficiency-of-the-evidence grounds where the material facts are undisputed and only an issue of law is presented" because "the existence of undisputed facts obviate[s] the need for the district court to make factual determinations properly reserved for a jury."  *Yakou*, 428 F.3d at 246-247.  *See e.g.*

*United States v. Nitschke*, 843 F. Supp. 2d 4, 16 (D.D.C. 2011) (granting pretrial motion to dismiss indictment where defendant failed to violate criminal statute as a matter of law based on the undisputed facts).

"When ruling on a motion to dismiss an indictment, the district court assumes the truth of the factual allegations in the indictment and the government's proffered facts." *United States v. Naik,* 2020 WL 534539, at *2 (D.D.C. Feb. 2, 2020) (citing *United States v. Ballestas*, 795 F.3d 138, 149 (D.C. Cir. 2015)).

## IV.    ARGUMENT

### A.    Count One for Felony Obstruction of an Official Proceeding Must Be Dismissed Because the Statute Is Unconstitutionally Vague and Because Mr. Purse Did Not Disrupt an Official Proceeding

In Count One, the government contends that Mr. Purse committed the felony of "Obstruction of an Official Proceeding" when he allegedly entered the Capitol Building.

According to 18 Section 1512(c):

> Whoever corruptly –
>
> > (1) alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with the intent to impair the object's integrity or availability for use in an official proceeding; or
> >
> > (2) Otherwise obstructs, influences, or impedes any official proceeding, or attempts to do so, ... shall be fined ... or imprisoned.

18 U.S.C. § 1512(c).

The government contends that Mr. Purse violated Section 1512(c)(2) because he obstructed, influenced, and impeded the Certification of the Electoral College vote.  (Doc. 9 at p.

1).  As explained below, the government's contention fails as a matter of law for several reasons, and thus this Count must be dismissed.

     1.       **<u>Section 1512(c)(2) Only Prohibits Evidence Tampering, which Mr.</u>**
                  **<u>Purse Is Not Alleged to Have Engaged in</u>**

The government's contention that Mr. Purse violated Section 1512(c)(2) by disrupting the Certification of the Electoral College vote fails as a matter of the law because the statute only prohibits *evidence tampering* and there are no allegations that Mr. Purse took any actions with respect to evidence.

The "first step in interpreting a statute is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997).  "The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Id.* at 341.  Moreover, "where text, structure, and history fail to establish that the Government's position is unambiguously correct" the Court should "apply the rule of lenity and resolve the ambiguity in [the defendant's] favor." *United States v. Granderson*, 511 U.S. 39, 54 (1994); *see also United States v. Villanueva-Sotelo*, 515 F.3d 1234, 1247 (D.C. Cir. 2008) (applying rule of lenity to resolve ambiguities in statute in favor of defendant).

Here, evaluating Section 1512(c)(2) reveals that the statute only pertains to tampering with documentary evidence.  Accordingly, because Mr. Purse is not alleged to have taken any action with respect to evidence, this count must be dismissed.

a.      **The Certification of the Electoral College Vote Is Not an "Official Proceeding" Because It Does Not Involve the Presentation of Evidence to Congress**

The government's contention that Mr. Purse obstructed an "official proceeding" fails at the onset because the Certification of the Electoral College vote is not an "official proceeding" that can give rise to liability under Section 1512(c)(2).  Although the definition of "official proceeding" includes "a proceeding before the Congress," the term "proceeding" itself is not defined in the U.S. Code.  *See* 18 U.S.C. § 1515(a)(1)(B).  Accordingly, whether the Certification of the Electoral College is an "official proceeding" turns on what Congress meant by the word "proceeding."  *See e.g. United States v. Ermoian*, 752 F.3d 1165, 1169 (9th Cir. 2013) ("[T]he definition of the phrase 'official proceeding' depends heavily on the meaning of the word 'proceeding'" because "that word is used—somewhat circularly—in each of the definitions for an 'official proceeding.'").

In *Ermoian*, the Ninth Circuit reversed a conviction under Section 1512(c)(2) because they found that an FBI investigation was not "a proceeding before a Federal Government agency" under Section 1515(a)(1)(C).  *Ermoian*, 752 F.3d at 1172-73.  In reaching this decision, the Ninth Circuit first noted that "both lay and legal dictionaries suggests that definitions of the term fall into one of two categories: 'proceeding' may be used either in a general sense to mean '[t]he carrying on of an action or series of actions; action, course of action; conduct, behavior' or more specifically as a legal term to mean '[a] legal action or process; any act done by authority of a court of law; a step taken by either party in a legal case.'"  *Id.* at 1169.  The *Ermoian* Court found that "[s]everal aspects of the definition for 'official proceeding' suggest that the legal— rather than the lay—understanding of term 'proceeding' is implicated in the statute."  *Id.* at 1170.

7

Specifically, the Court noted:

- "The descriptor 'official' indicates a sense of formality normally associated with legal proceedings, but not necessarily with a mere 'action or series of actions.'" *Id.*

- "The word 'proceeding' is surrounded with other words that contemplate a legal usage of the term, including 'judge or court,' 'Federal grand jury,' 'Congress,' and 'Federal Government agency.'" *Id.*

- "'Proceeding' is a word much used to express the business done in courts' and 'is an act done by the authority or direction of the court, express or implied.'" *Id.*

- "The use of the preposition 'before' suggests an appearance in front of the agency <u>sitting as a tribunal</u>." *Id.* at 1171 (emphasis added).

- "Section 1512 refers to 'prevent[ing] the attendance or testimony of any person in an official proceeding'; 'prevent[ing] the production of a record, document, or other object, in an official proceeding'; and 'be[ing] absent from an official proceeding to which that person has been summoned by legal process.'" which "strongly implies that <u>some formal hearing before a tribunal</u> is contemplated." *Id.* at 1171-72 (emphasis added).

Similarly, in *Ramos*, the Fifth Circuit concluded that an internal Border Patrol investigation did not constitute an "official proceeding" that could give rise to liability under Section 1512(c)(2). *United States v. Ramos*, 537 F.3d 439, 464 (5th Cir. 2008) . In reaching this decision, the *Ramos* Court noted that "Section 1512 is titled 'Tampering with a witness, victim, or an informant,'" and that "the statute is focused on incidents in which <u>one person has exercised direct or indirect force or influence on another in order to corrupt some official proceeding</u>" which is "'in keeping with the stated purpose of the statute: '[t]<u>o enhance and protect the necessary role of crime victims and witnesses in the criminal justice process</u>.'" *Id.* at 462 (citing Pub.L. No. 97–291, § 2, 96 Stat. 1248 (1982) (emphasis added)).

The Fifth Circuit also noted that Section 1512(c) was "enacted as part of the Sarbanes–Oxley Act of 2002"— which was "legislation against mayhem, murder and intimidation in criminal proceedings and <u>for the protection for witnesses and victims</u> from such conduct"—and

found that the phrase "'official proceeding' is consistently used throughout § 1512 in a manner
that contemplates a formal environment in which persons are called to appear or produce
documents." *Id.* at 462-63  (emphasis added).[3]

      This Court should adopt the reasoning of *Ramos* and *Ermoian* and find that the
Certification of the Electoral College vote was not an "official proceeding" that can give rise to
liability under Section 1512(c)(2).  Section 1512 is a crime under "Chapter 73 -  Obstruction of
Justice" and all of the crimes under Chapter 73 involve improper interference with a process
involving either an investigation or a tribunal.  Indeed, the Department of Justice's own Resource
Manual explains that Section 1512 "proscribes conduct intended to illegitimately affect the
presentation of evidence in Federal proceedings…." *See* DOJ Resource Manual § 1729.[4]  As
such, a "proceeding before Congress" should be given a meaning consistent with the clear intent
of the statute—prohibiting the improper interference or influence over Congressional hearings
which involve witness testimony or the production of documentary evidence.

      The government has not, and cannot, provide any evidence that the Certification of the
Electoral College vote is the type of hearing that the Section 1512 was designed to protect.
It does not involve a Congressional inquiry or investigation, and it does not involve the
presentation of evidence to Congress.  In short, the Certification of the Electoral College simply
is not the type of hearing implicated by Section 1512(c)(2) and thus, this count must be
dismissed as a matter of law.

---

[3] The *Ramos* and *Ermoian* interpretations of "official proceeding" have also been approved of by
the Fourth Circuit.  *See United States v. Young*, 916 F.3d 368, 384 (4th Cir. 2019).

[4] *https://www.justice.gov/archives/jm/criminal-resource-manual-1729-protection-government-
processes-tampering-victims-witnesses-or*.

**b.**      **Section 1512(c)(2) Only Prohibits Obstructing an Official**
**Proceeding Through Actions with Respect to Documents,**
**Records, or Similar Documentary Evidence**

Even if the Certification of the Electoral College were considered an "official

proceeding" under Section 1512(c)(2), at the very least the conduct prohibited under the statute

must be interpreted as only prohibiting a person from taking some action with respect to

documentary evidence, such as documents or records, in order to corruptly obstruct, impede or

influence an official proceeding.  *See United States v. Miller*, No. 21-cr-00119 (CJN), Dkt. No.

72 at p. 20 (D.D.C. Mar. 7, 2022) (dismissing Section 1512(c)(2) charge in January 6, 2021

protest case because the defendant was not alleged to "have taken some action with respect to a

document, record, or other object in order to corruptly obstruct, impede or influence an official

proceeding."); *United States v. Fischer*, 2022 WL 782413, at *4 (D.D.C. Mar. 15, 2022) (same).

In *Miller*, the Court engaged in a thorough analysis of Section 1512(c)(2) and held that it

should be interpreted as requiring "that the defendant have taken some action with respect to a

document, record, or other object in order to corruptly obstruct, impede or influence an official

proceeding."  The *Miller* Court's holding regarding the scope of Section 1512(c)(2) was based

on its interpretation of the meaning of the word "otherwise" at the beginning of the subsection.

*Miller*, Dkt. No. 72 at p. 11.

To decipher the meaning of "otherwise" the Court first looked at the definition of the

word and noted that "[w]hen § 1512(c) became law, 'otherwise' had three different definitions

that are plausible in this context: 'in a different way or manner: differently'; 'in different

circumstances: under other conditions'; and 'in other respects.'"  *Id.* (citing *Otherwise*, *Webster's*

*Third New Int'l Dictionary of the English Language Unabridged* (2002)).  Based on these

definitions, the Court found that the word "otherwise" in Section 1512(c)(2) could be interpreted in three possible ways:

1.      It could represent a clean break such that "subsections (c)(1) and (c)(2) are not related at all,"

2.      "Subsection (c)(1) may contain just examples of the much broader prohibition contained in subsection (c)(2)," or

3.      Subsection (c)(2) could be a residual clause for subsection (c)(1) and thus "subsection (c)(2) may be limited by" the conduct prescribed by subsection (c)(1).

*Id.* at pp. 19-20.

In *Miller*, the government took the position that the Court should apply either of the first two definitions and find that *any act* of obstructing, influencing, or impeding an official proceeding is criminalized by subsection (c)(2).  However, the *Miller* Court rightfully rejected the government's contention because this interpretation is simply not tenable after considering the text of the statute, the statutory context of the subsection, the historical development of the statute, and subsection's legislative history.

        (i)      <u>The Text of the Statute Suggests that Subsection (c)(2) Is</u>
                  <u>Limited by the Conduct Prohibited in Subsection (c)(1)</u>

The Court in *Miller* first looked to the plain text of Section 1512 to determine which definition of "otherwise" was appropriate and found that the text favored the interpretation proffered by the defendant—that the conduct prohibited by subsection (c)(2) is limited by the conduct proscribed in subsection (c)(1).

When interpreting a statute, "effect should be given to every word of a statute whenever possible."  *Leocal v. Ashcroft*, 543 U.S. 1, 3 (2004); *see also Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979).  In *Miller*, the Court rejected the government's interpretation of "otherwise" as

representing a clean break because this would "not give meaning to the word 'otherwise'" and the word  "would be pure surplusage." *Miller*, Dkt. No. 72 at p. 12.

Similarly, the Court also found that the government's second proffered interpretation, that subsection (c)(1) provides specific examples of the conduct prohibited by section (c)(2), also failed to give meaning to every word.  The Court noted that under this interpretation, subsections (c)(1) and (c)(2) are linked in that they both prohibit conduct related to an official proceeding. *Id.* at p. 15.  However, the Court found even under this interpretation, the use of the word "otherwise" would still be superfluous because "both subsections include the term 'official proceeding,' suggesting that the common link should be something other than the pendency of an official proceeding; otherwise there would be no reason to repeat the term in both subsections." *Id.* at pp. 15-16.  Additionally, the Court found that the structure of subsection (c)(2) cut against this interpretation because if subsection (c)(1) only provided examples of conduct prohibited by subsection (c)(2), then subsection (c)(2) would be the only offense listed in subsection (c) and a reasonable reader would not expect the actual offense to come second.  *Id.* at p. 16.

Thus, the *Miller* Court found that the defendant's proffered interpretation, that the conduct prohibited by subsection (c)(2) was limited by the conduct prohibited in subsection (c)(1) "seems to present the fewest interpretive problems." *Id.* at 20.  Moreover, the Court found that this interpretation was consistent with the majority opinion in *Begay v. United States*, 553 U.S. 137 (2008).

In *Begay*, the Supreme Court analyzed whether driving under the influence was considered a violent felony in the context of the Armed Career Criminal Act ("ACCA"). The ACCA defined a violent felony, in pertinent part, as "burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another."  18 U.S.C. § 924(e)(2)(B).  Thus, in order to determine whether driving under

the influence qualified as a violent felony, the Supreme Court interpreted the meaning of "otherwise involves conduct that presents a serious potential risk of physical injury to another." *Begay*, 553 U.S. at 142.  The Supreme Court held that "the provision's listed examples— burglary, arson, extortion, or crimes involving the use of explosives" "illustrate the kinds of crimes that fall within the statute's scope" and that "their presence indicates that the statute covers only similar crimes, rather than every crime that 'presents a serious potential risk of physical injury to another.'"  *Id.*  The Court reasoned that if the Congress intended for "the statute to be all encompassing, it is hard to see why it would have needed to include the examples at all" since they would be criminalized by the later clause.  *Id.*  Accordingly, the Court rejected the government's proffered interpretation that "'otherwise' is sufficient to demonstrate that the examples do not limit the scope of the clause."  *Id*. at 144.  Instead, the *Begay* Court held that that to give effect to every clause and word of this statute, it must be read such that the examples "limit[ed] the crimes that clause (ii) covers to crimes that are <u>roughly similar, in kind as well as in degree of risk posed, to the examples themselves</u>."  *Id.* (emphasis added).

The *Miller* Court correctly determined that, consistent with *Begay*, a plain reading of Section 1512(c) suggests that subsection (c)(2) should be construed as being limited to prohibiting similar types of conduct to the conduct which is prohibited by subsection (c)(1).

(ii)    <u>The Statutory Context Does Not Support Giving</u>

<u>Subsection (c)(2) a Scope Broader Than (c)(1)</u>

The Court in *Miller,* next looked at the broader context of subsection (c)(2) in relationship to the rest of the statute and held that this too supports an interpretation that the scope of (c)(2) is limited by subsection (c)(1), not broader than it.  First, the Court noted that "the other subsections of the statute criminalize fairly discrete conduct in narrow contexts" and that if subsection (c)(2) were interpreted broadly it "would be the only provision in § 1512 not to have a

narrow focus." *Miller*, Dkt. No. 72 at pp. 20-21.  For example, subsections (a), (b), and (d) of Section 1512 are all narrowly focused on improperly influencing others—subsection (a) prohibits violence (or threats of violence) against people giving testimony in an official proceedings, subsection (b) prohibits the improper influencing the testimony of people in an official proceedings through threats or intimidation, and subsection (d) is prohibits harassing people to, prevent them from, among other things, attending or giving testimony in an official proceeding.  Thus, it is consistent with the other subsections in Section 1512 to similarly interpret subsection (c) as narrowly seeking to prohibit individuals from tampering with documentary evidence in an effort to obstruct, influence, or impede an official proceeding.

Moreover, the *Miller* Court further reasoned that if (c)(2) were to be interpreted as prohibiting any and all conduct which obstructs, influences, or impedes, that would render at least eleven other subsections in Section 1512 completely superfluous, because they all involve some form of obstructing, influencing, or impeding an official proceeding.  *Id.* at pp. 21-22. The Court thus found that "such substantial overlap within the same section suggests that Congress did not mean § 1512(c)(2) to have so broad a scope."  *Id.* at p. 22.

(iii)   The Historical Development of Section 1512 Supports a Narrow Interpretation of Subsection (c)(2)

The *Miller* Court then looked at the historical development of Section 1512 and found that this too supported the interpretation that subsection (c)(2) should be construed as being limited by the crimes prohibited by subsection (c)(1).  The Court noted that prior to the enactment of subsection (c), Section 1512 only criminalized actions directed at influencing other people.  Thus, it was "unlawful to cause 'another person' to take certain steps—such as to 'alter, destroy, mutilate, or conceal an object'—but did not make it unlawful for a person to take such action directly."  *Id.* at p. 23.  The Court then found that that subsection (c) filled this gap by

making direct action illegal, and that the section "took much of its language from § 1512(b)." *Id.* at pp. 23-24. Thus, the Court concluded that "[a] fair inference is that, by adding subsection (c) to fill the gap in § 1512, and by drawing heavily from a single provision out of four already included in subsection (b), Congress intended subsection (c) to have a narrow, limited focus— just like subsection (b)(2)(B)." *Id.* at 25.

Additionally, the Court in *Miller* found that the subsequent history of Section 1512 suggested that subsection (c)(2) should be construed narrowly. Just three months after subsection (c) was enacted, subsection (a)(2)(B) was added which prohibits using physical force, or threats of physical force to cause or induce a person to "alter, destroy, mutilate, or conceal an object with intent to impair the object's integrity or availability for use in an official proceeding." The Court reasonably concluded that "if subsection 1512(c)(2) is as broad as the government contends" then "there would have been no need for the very same Congress to add § 1512(a)(2)(B) just three months later" because this conduct would have already been prohibited. *Id.*

      (iv)   <u>The Legislative History of Section 1512 Also Supports a Narrow Interpretation of Subsection (c)(2)</u>

Finally, the *Miller* Court reviewed the legislative history of subsection (c) and found that this too supported a narrow interpretation. As explained in Section IV.A.1.a. *supra*, section 1512(c) was enacted as part of the Sarbanes–Oxley Act of 2002. "The Sarbanes–Oxley Act… was prompted by the exposure of Enron's massive accounting fraud and revelations that the company's outside auditor, Arthur Andersen LLP, had systematically destroyed potentially incriminating documents." *Yates v. United States*, 574 U.S. 528, 535–36 (2015).

Because, as noted in Section IV.A.1.b.(iii), *supra*, Section 1512 only prohibited taking actions with respect to others, and not direct action, Section 1512 was enacted to criminalize

direct evidence tampering.  Thus, the legislation history "suggests that, in the wake of the Enron scandal, Congress was faced with a very specific loophole: that then-existing criminal statutes made it illegal to cause or induce *another* person to destroy documents, but did not make it illegal to do so by oneself. Congress closed that loop by passing subsection (c), and nothing in the legislative history suggests a broader purpose than that."  *Miller*, Dkt. No. 72 at p. 28.

(v)     <u>Even If Two Interpretations of the Statute Are Plausible,</u>

<u>the Rule of Lenity Applies</u>

Although the *Miller* Court found that reading subsection (c)(2) as being limited by the conduct proscribed in subsection (c)(1) was "the better" interpretation, it found that reading subsection (c)(1) as providing examples of conduct which violates (c)(2) was at least plausible. *Id.* at 28.  However, the Court found that, at the very least, there is "a serious ambiguity in a criminal statute" and thus, the rule of lenity required the Court to interpret any ambiguities in the defendant's favor.  *Id.*

Accordingly, even if this Court were to find that it is unclear what the correct interpretation of subsection (c)(2) is, the Court should still construe the statute in Mr. Purse's favor and dismiss this count because he is not alleged to have taken any action with respect to documentary evidence (i.e., with respect to a document, record, or other object) in order to obstruct, impede or influence Congress's Certification of the Electoral College vote.

2. **Mr. Purse Could Not Have Obstructed the Certification of the Electoral College Vote as a Matter of Law Because the Government Concedes that He Entered the Capitol Building After the Session Was Already Suspended and Only Observed While Inside for a Few Minutes**

Even if the Certification of the Electoral College vote could be considered an "official proceeding" (and it cannot), Count One should still be dismissed because Mr. Purse did not, and could not, have obstructed the Certification of the Electoral College vote.

Although Section 1512(f)(1) provides that "official proceeding need not be pending or about to be instituted at the time of the offense," to give rise to liability under Section 1512(c)(2), the defendant's obstructive conduct must have "'a relationship in time, causation, or logic with the [official] proceedings.'" *United States v. Aguilar*, 515 U.S. 593, 599 (1995); *United States v. Ring*, 628 F. Supp. 2d 195, 223 (D.D.C. 2009). "[I]n other words, 'the endeavor must have [had] the natural and probable effect of interfering with'' the official proceeding." *Ring*, 628 F. Supp. 2d 195, 223 (D.D.C. 2009) (citing *United States v. Reich*, 479 F.3d 179, 185 (2d Cir. 2007)) (emphasis added).

Here, the facts proffered by the government establish that there is no possible way that Mr. Purse's alleged actions had the "natural and probable effect" of interfering with the Certification of the Electoral College vote. First, Mr. Purse is not alleged to have entered the Capitol Building until thirty-nine minutes *after* the joint session was suspended, and he left the Capitol Building over five hours *before* it resumed. Second, Mr. Purse is only accused of spending a total of thirteen minutes in the Capitol Building, approximately nine minutes of which was him attempting to exit the building. Moreover, while he was in the Capitol Building, he is only alleged to have stood "off the side, observing" while holding a video camera. Third,

the crowd remained in the Capitol Building after Mr. Purse left and thus Mr. Purse's presence

did not add or contribute to any delay in resuming the joint session.  In fact, the government

contends that Mr. Purse left as the crowd was growing *more* volatile, not beginning to dwindle.

Accordingly, Mr. Purse's alleged actions of entering the Capitol Building and observing

the crowd for a few minutes after the Congressional session had already been suspended had no

effect on the Certification of the Electoral College vote, nor did his alleged actions have the

natural and probable consequence of interfering with the Certification of the Electoral College

vote.  As such, the Section 1512(c)(2) charge must be dismissed.

3.   **The Term "Corruptly" Is Unconstitutionally Vague as Applied to Mr.**
     **Purse and in Any Event, There Is No Evidence that Mr. Purse**
     **Intended to Disrupt the Certification of the Electoral College Vote**

Moreover, Count One must also be dismissed because the term "corruptly" is

unconstitutionally vague as applied to Mr. Purse.  "Vague laws may not be enforced because

they "contravene the 'first essential of due process of law' that statutes must give people 'of

common intelligence' fair notice of what the law demands of them" and because they

"undermine the Constitution's separation of powers" by "hand[ing] responsibility for defining

crimes to relatively unaccountable police, prosecutors, and judges, eroding the people's ability to

oversee the creation of the laws they are expected to abide."  *United States v. Davis*, 139 S. Ct.

2319 (2019) (citations omitted).  Accordingly, "the void-for-vagueness doctrine requires that a

penal statute define the criminal offense with sufficient definiteness that ordinary people can

understand what conduct is prohibited and in a manner that does not encourage arbitrary and

discriminatory enforcement."  *Kolender v. Lawson,* 461 U.S. 352, 357 (1983).

In *Poindexter*, the D.C. Circuit found that the word "corruptly" as used in 18 U.S.C.

Section 1505 was unconstitutionally vague as applied to the defendant.  *United States v.*

18

*Poindexter*, 951 F.2d 369, 386 (D.C. Cir. 1991).  The government claimed that the defendant

made "false and misleading statements to Members of the Congress" which "'corruptly

influence[d], obstruct[ed] and impede[d]' congressional inquiries."  *Id.* at 377.  The *Poindexter*

Court first noted that, "on its face, the word 'corruptly' is vague" and that "in the absence of

some narrowing gloss, people must 'guess at its meaning and differ as to its application.'"  *Id.* at

378.  Next, the Court found that that the term 'corruptly' could either be used transitively, i.e.

"by means of corrupting another" or intransitively, i.e. "acting oneself 'in a corrupt… manner.'"

*Id.* at 379.  The Court found that the term corruptly clearly did not give fair notice that it applied

to making false statements to Congress and thus declined to determine the precise scope of

conduct prohibited by the statute.  *Id.* at 386.  However, the Court did note that interpreting the

statute as "reach[ing] only a person who, for the purpose of influencing an inquiry, influences

another person (through bribery or otherwise) to violate a legal duty… may be useful as a

description of the 'core' behavior to which the statute may constitutionally be applied." *Id.* at

385.

     As with Section 1505, Section 1512(c)(2) prohibits individuals from corruptly

obstructing, influencing, or impeding a Congressional proceeding. 18 U.S.C. § 1505 *cf.* 18

U.S.C. § 1512(c)(2).  Accordingly, the Court's analysis of Section 1505 in *Poindexter* applies

with equal force to Section 1512(c)(2)—the statute should be construed transitively, i.e., as

prohibiting individuals from influencing others (i.e., witnesses) from violating their legal duty.

     In response to the Court's decision in *Poindexter*, Congress enacted a statutory definition

of the term "corruptly."  Now, according to section 1515(b), "[a]s used in section 1505, the term

'corruptly' means acting with an improper purpose, personally or by influencing another,

including making a false or misleading statement, or withholding, concealing, altering, or

destroying a document or other information."  18 U.S.C. § 1515(b).  Thus, this new definition

clarifies that "Congress intended the word 'corruptly' … to be used in both the transitive and the intransitive sense." *United States v. Kanchanalak*, 37 F. Supp. 2d 1, 4 (D.D.C. 1999).  However, Congress expressly limited this expanded definition of 'corruptly' to Section 1505, a clear indication that Congress intended for *Poindexter*'s limitation of "corruptly" to the transitive use of the word to remain for purposes of analyzing Section 1512(c)(2).

Moreover, even if the new expansive definition of "corruptly' could be applied to Section 1512(c)(2), the statute remains unconstitutionally vague as applied to Mr. Purse because this new definition still does not clarify why type of act is prohibited.  "'Vague terms do not suddenly become clear when they are defined by reference to other vague terms.'"  *Poindexter*, 951 F.2d at 378 (D.C. Cir. 1991) (citing *Cartwright v. Maynard*, 822 F.2d 1477, 1489 (10th Cir.1987)). Accordingly, defining 'corruptly' to mean "with an improper purpose" does not make the term any less vague.  *See e.g. Poindexter*, 951 F.2d at 379 ("Words like 'depraved,' 'evil,' 'immoral,' 'wicked,' and '<u>improper</u>' are no more specific—indeed they may be less specific—than 'corrupt.'") (emphasis added).

Indeed, in *Kanchanalak*, the Court noted that the definition's reference to 'acting with an improper purpose' may "not alleviate the concerns expressed by [*Poindexter*]" but nonetheless found the statute constitutional, as applied to the defendants, because their specific conduct fell within the definition's "list the kinds of specific conduct proscribed."  *Kanchanalak*, 37 F. Supp. 2d at 4.  Here, unlike in *Kanchanalak*, Mr. Purse's alleged conduct of entering the Capitol Building to observe and record the protestors is not even remotely implicated in the list of the specific actions prohibited in Section 1515(b)—Mr. Purse is not charged with making a false or misleading statement, or withholding, concealing, altering, or destroying evidence.  As such, there is nothing about the text of Section 1512(c)(2) which gives notice that the use of "corruptly" applies to Mr. Purse's alleged conduct.

Finally, at the very least, corruptly must be construed as requiring a defendant to act with the specific intent to obstruct an official proceeding. *See e.g., United States v. Delgado*, 984 F.3d 435, 452 (5th Cir. 2021) ("[A] person acts 'corruptly' under [Section 1512(c)(2)] when they act 'knowingly and dishonestly, with specific intent to subvert or undermine the due administration of justice.'") (citing *United States v. Coppin*, 569 F. App'x 326, 334 (5th Cir. 2014); *United States v. Gordon*, 710 F.3d 1124, 1149 (10th Cir. 2013) ("[A] defendant must act with the intent that his actions will influence a[n applicable] proceeding.") (citing *United States v. Phillips*, 583 F.3d 1261, 1263 (10th Cir. 2009).  The government has not alleged any facts which indicate that Mr. Purse entered the Capitol Building with the *intent* of impeding or influencing the Certification of the Electoral College vote.  Nor could they, because as explained in section IV.A.2, *supra*, the Certification of the Electoral College vote had been suspended thirty-nine minutes prior to when Mr. Purse is alleged to have entered the Capitol Building. To the contrary, the government concedes that Mr. Purse has a website primarily used for livestreaming, and Mr. Purse's alleged actions in the Capitol Building are consistent with livestreaming the protest.  The government does not accuse Mr. Purse of participating in the protest while in the Capitol Building, only that he stood off to the side, observing and recording the protestors, all while wearing clothing indicating that he was with the Press.  These alleged actions are nowhere near sufficient to satisfy any conceivable definition of the word "corruptly" because they do not reflect they he entered the Capitol Building with the specific intent to disrupt the Certification of the Electoral College vote.

In sum, the term "corruptly" is unconstitutionally vague, but under any construction of the word, the statute cannot reasonably be interpreted as applying to the act of entering the Capitol Building for the purpose of livestreaming the protest, after the Certification of the Electoral College vote had already been suspended.

**B.** **Counts Two and Three Must Be Dismissed Because the Government Has Not Alleged Any Facts Indicating that Mr. Purse Knowingly Entered a Restricted Building or Grounds**

**1.** **The Term "Restricted Area" Is Unconstitutionally Vague as Applied to Mr. Purse and Regardless the Government Has Not Sufficiently Alleged that the Capitol Building Was a Restricted Area**

Counts Two and Three of the Indictment charge Mr. Purse with violating Title 18 U.S.C. Sections 1752(a)(1) and 1752(a)(2) based on his alleged action of entering the Capitol Building, which they claim was a "restricted buildings or grounds.'" Both of these counts fail as a matter of law, however, because the Capitol Building was not a "restricted buildings or grounds" under the statute.

"The term 'restricted buildings or grounds' means any posted, cordoned off, or otherwise restricted area (A) of the White House or its grounds, or the Vice President's official residence or its grounds; (B) of a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting; or (C) of a building or grounds so restricted in conjunction with an event designated as a special event of national significance." 18 U.S.C. §1752(c)(1). Preliminarily, this statute is unconstitutionally vague because it is written in the passive voice and thus is unclear *who* precisely can make an area restricted by "post[ing], cordon[ing] off, or otherwise restrict[ing]" the area. It would be nonsensical to interpret this statute as permitting *anyone* from creating a restricted area merely by posting a sign.[5] As such,

---

[5] For example, if the President is eating dinner at a restaurant, the restaurant manager could not unilaterally turn the restaurant into a "restricted building or grounds" merely by posting a closed sign on the door.

an ordinary person would not understand whether Section 1752 authorized the Capitol Police to

create a restricted area and thus the statute is unconstitutionally vague as applied to Mr. Purse.

Moreover, even if the definition of "restricted buildings or grounds" were not

unconstitutionally vague (and it is), the government has not, and cannot, sufficiently allege that

the Capitol Building was a "restricted buildings or grounds" under the statute.  As the broader

context of the statute makes clear, Congress only intended for the Secret Service, or at the very

least, a Federal Law enforcement agency acting *in coordination with* the Secret Service, to create

a "restricted area" under Section 1752.  All three of the definitions of "restricted area" involve

areas where there are individuals under the Secret Service's protection[6] and Section 3056, which

enumerates the powers of the Secret Service, makes it a crime to that "knowingly and willfully

obstructs, resists, or interferes with a **Federal law enforcement agent** engaged in the

performance of the protective functions authorized by … section 1752."  18 U.S.C. § 3056(d)

(emphasis added).  As such, the statute was clearly intended to give the *Secret Service* the

authority to restrict areas to protect individuals within their supervision.  Indeed, when Section

1752 was amended to include "the White House or its grounds" to the definition of restricted

building, the legislative history makes clear that the statute was designed to provide the Secret

Service with the authority to restrict the White House.  *See* H.R. REP. 112-9, 2012 U.S.C.C.A.N.

263, 264 (Feb. 11, 2011) ("[T]here is no Federal law that expressly prohibits unlawful entry to

the White House and its grounds" and therefore "[t]he Secret Service must … rely upon a

provision in the District of Columbia Code, which addresses only minor misdemeanor

infractions, when someone attempts to or successfully trespasses upon the grounds of the White

House.") (emphasis added).

---

[6] The Secret Service is responsible for "the planning, coordination, and implementation of
security operations at special events of national significance."  18 U.S.C. § 3056(e)(1).

Here, the government contends that Mr. Purse entered a restricted area solely based on the fact that the U.S. Capitol Police placed "temporary and permanent barricades around the exterior of the" Capitol Building and Vice President Pence, who is protected by the Secret Service, was visiting the Capitol Building.  However, the government has neither alleged, nor proffered any evidence suggesting, that the barriers were placed around the Capitol Building in coordination with the Secret Service.  Absent any such coordination, the Capitol Building cannot be considered a "restricted area" under Section 1752 and as a matter of law and Counts Two and Three must be dismissed.

       2.       **Even if the Capitol Building Were a Restricted Area, the Government Has Not Alleged Sufficient Facts Indicating Mr. Purse Knew That It Was a Restricted Area When He Allegedly Entered the Capitol Building**

Moreover, even if the Secret Service had coordinated with the Capitol Police to secure the area and thus the Capitol Building could be considered a restricted area under Section 1752, the government's claim that Mr. Purse violated Section 1752(a)(1) still fails as a matter of law. Under Section 1752, a person may not "**knowingly** enter[] or remain[] in any restricted building or grounds without lawful authority to do so or attempt[] or conspire[] to do so." 18 U.S.C. §1752(a)(1) (emphasis added).  Accordingly, the government must prove that, at the time Mr. Purse allegedly entered the Capitol Building, he (1) knew the area was "posted, cordoned off, or otherwise restricted" (2) knew those restrictions were put in place by a Federal law enforcement agency in coordination with the Secret Service, and (3) knew that there was a person protected by the Secret Service in the Capitol Building.  The government has not alleged any facts which indicate any of these three elements have been satisfied.  To the contrary, the government concedes that the protestors removed the temporary barriers and forced their way into the Capitol

Building at 2:00 p.m., nearly an hour before Mr. Purse is alleged to have entered the building. [Doc. 2-1].

Moreover, even if Mr. Purse had seen the barriers, he would have no reason to suspect that they were put in place in coordination with the Secret Service.  The U.S. Capitol Police are responsible for protecting the Capitol Building and the government concedes that "[t]he U.S. Capitol is secured 24 hours a day by U.S. Capitol Police."  (Doc. 2-1); *see also 2* U.S.C. § 1961(a).  Accordingly, Mr. Purse could not have known that on this particular day, the Capitol Police was acting in coordination with the Secret Service, and thus could not have known that the area was "restricted" under Section 1752.  *See United States v. Bursey*, 416 F.3d 301, 309 (4th Cir. 2005) (affirming conviction under Section 1752(a)(1) because there was evidence that the defendant "understood the restriction to have been created by the Secret Service **(as opposed to state or local law enforcement**) (emphasis added).

Finally, Mr. Purse could not have known that there was a person protected by the Secret Service in the Capitol Building at the time he entered.  The government concedes that at approximately 2:20 p.m., thirty-nine minutes before Mr. Purse is alleged to have entered the Capitol Building, Congress and Vice-President Pence evacuated the Senate and House chambers. Although the government now contends that Vice-President Pence remained in the Capitol Building, this was not widely publicized and thus there was no way for Mr. Purse to have known that Vice-President Pence was still in the Capitol Building at the time that he allegedly entered.

Accordingly, the government has not sufficiently alleged facts, nor proffered sufficient evidence, which establishes that Mr. Purse *knowingly* entered a restricted area when he allegedly entered the Capitol Building.  As such, Count Two for violation of Section 1752(a)(1) fails as a matter of law and must be dismissed.

**C.**     **Counts Three, Four, and Five Must Be Dismissed Because, Based on the Government's Allegations, Mr. Purse Did Not Violate These Statutes as a Matter of Law**

Counts Three, Four and Five all fail for the same reason—Mr. Purse's alleged conduct did not violate the statutes and there are no allegations or evidence indicating that he had the necessary intent. Counts Three and Four allege that Mr. Purse violated 18 U.S.C. Section 1752(a)(2) and 40 U.S.C. Section 5104(e)(2)(D), respectively, for engaging in "disruptive and disorderly conduct" in the Capitol Building.

Section 1752(a)(2) prohibits "knowingly, and with intent to impede or disrupt the orderly conduct of Government business or official functions, engage[] in disorderly or disruptive conduct in, or within such proximity to, any restricted building or grounds when, or so that, such conduct, in fact, impedes or disrupts the orderly conduct of Government business or official functions." 18 U.S.C. § 1752(a)(2).

Similarly, Section 5104(e)(2) prohibits "willfully and knowingly… utter[ing] loud, threatening, or abusive language, or engag[ing] in disorderly or disruptive conduct, at any place in the Grounds or in any of the Capitol Buildings with the intent to impede, disrupt, or disturb the orderly conduct of a session of Congress either House of Congress…" 40 U.S.C. § 5104(e)(2)(D).

Finally, Count Five alleges that Mr. Purse violated Section 5104(e)(2)(G) which prohibits "[a]n individual or group of individuals may not willfully and knowingly… parade, demonstrate, or picket in any of the Capitol Building." 40 U.S.C. § 5104(e)(2)(G).

1. **There Are No Allegations That Mr. Purse Engaged in Disorderly or Disruptive Conduct, nor That He Demonstrated, Picketed, or Paraded in the Capitol Building**

As explained in Section IV.A.2. *supra*, the facts proffered by the government establish that Mr. Purse did not engage in disorderly or disruptive conduct while in the Capitol Building, nor did he demonstrate, picket, or parade in the building.  The government only alleges that Mr. Purse spent a total of thirteen minutes in the Capitol Building, approximately nine minutes of which was him <u>attempting to exit</u> the building.  Moreover, while he was in the Capitol Building, he is only alleged to have stood "off the side, observing" while holding a video camera.  Nothing about this conduct could be considered "disorderly or disruptive," nor could it be described as demonstrating, picketing, or parading.  This alone warrants dismissing Counts Three to Five.

Moreover, Count Three also must be dismissed because Mr. Purse's alleged conduct could not have impeded or disrupted any government business—Mr. Purse is alleged to have entered the Capitol Building thirty-nine minutes *after* the joint session was *suspended*, and he left the Capitol Building over five hours before it resumed.  As such, the thirteen minutes that Mr. Purse allegedly spent in the Capitol Building (again, nine minutes of which was spent attempting to leave), could not have possibly had an effect on any government business.

2. **There Are No Allegations That Mr. Purse Intended To Do Anything Other Than Livestream the Protest on His Website While in the Capitol Building**

Even if Mr. Purse's alleged actions could be considered "disorderly or disruptive" conduct and described as demonstrating, picketing, or parading (and they cannot), Counts Three, Four, and Five still must be dismissed because the government fails to allege any facts to support a finding that Mr. Purse possessed the necessary intent required under the statutes.

As explained in Section IV.A.3, *supra*, the government concedes that Mr. Purse has a website primarily used for livestreaming, and Mr. Purse's alleged actions are consistent with entering the Capitol Building with the intent of livestreaming the protest.  The government only contends that Mr. Purse entered the Capitol Building after Congress had already evacuated, and that he merely stood off to the side, observing and recording the protestors, while wearing clothing indicating that he was with the Press.  The government does not allege that Mr. Purse took part in the protest while he was in the Capitol Building, only that he observed and recorded it.  As such, there is no basis for inferring the Mr. Purse intended to impede, disrupt, or disturb the orderly conduct of Congress when the entered the Capitol Building, or that he intended to demonstrate, picket, or parade while in the building.  Absent factual allegations indicating Mr. Purse had this intent, Counts Three, Four, and Five must be dismissed as a matter of law.

## V.    **CONCLUSION**

For the foregoing reasons, all pending charges fail as a matter of law and must be dismissed.

Dated:  March 31, 2022                    Respectfully submitted,

LARSON LLP


By:      */s/ Stephen G. Larson*
         Stephen G. Larson (DC Bar No. 1046780)
         Hilary Potashner (Admitted *pro hac vice)*
         LARSON LLP
         555 S. Flower Street
         Suite 4400
         Los Angeles, CA  90071
         Tel:  (213) 436-4888
         Attorneys for Defendant Matthew Purse