UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>  v.<br><br>MATTHEW THOMAS PURSE,<br><br>  Defendant. | Case No. 1:21-cr-00512-PLF |

**UNITED STATES' RESPONSE TO DEFENDANT PURSE'S MOTION
TO MODIFY ORDER SETTING CONDITIONS OF RELEASE**

The United States of America, through undersigned counsel, respectfully submits that defendant Matthew Thomas Purse's motion, ECF 37, seeking to modify the order setting conditions of his bond, should be denied.  The defendant, an active participant in the riot at the United States Capitol on January 6, 2021 and a felon with two prior fraud convictions[1], has engaged in significant efforts to conceal his location that include false claims of residence at an extended stay hotel.  His history includes the use of alias names.  He now requests an order allowing him to reside and receive pretrial supervision in Idaho, where he claims he will reside in an extended stay hotel.  For the reasons provided below, the United States is not prepared to agree to the relief the defendant requests.

**BACKGROUND**

---

[1] The defendant was convicted in *State of Arizona v. Matthew Thomas Purse*, Case No. CR2007-103670-001, for fraudulent scheme/artifices under Arizona Revised Statutes § 13-2310; on or about June 1, 2007, the defendant was sentenced to four months in jail and a three-year term of probation, with sentence conditions suspended.  In *United States v. Matthew Thomas Purse*, Case No. 08-CR-1350-GMS (D. Arizona), the defendant was convicted of conspiracy, 18 U.S.C. § 371, one count of mail fraud, 18 U.S.C § 1341, and one count of criminal copyright infringement, 18 U.S.C. §§ 2319(b)(1) and 17 U.S.C. § 506(a)(1)(A), and on January 11, 2010, the court imposed a sentence of incarceration for 21 months.

The charges against the defendant arise from his conduct during the attack on the United States Capitol on January 6, 2021.  Before that date, the defendant purchased a body-worn camera and obtained false press credentials in the name of Mark Basingthwaite.

**A.  The Defendant's Participation in the January 6, 2021 Attack on the U.S. Capitol**

On January 5, 2021, defendant flew from California to Washington, D.C. to attend the Save America rally at the Ellipse on the morning of January 6.  He checked into a hotel in the District of Columbia upon arrival.  On the morning of January 6, the defendant dressed in black tactical apparel and a helmet with the word "PRESS" in white lettering on his helmet and the front and back of a vest.  He activated his personal body-worn camera, which produced time-stamped recordings, and kept that camera running for almost all of that day.  The defendant attended the rally which he recorded and appeared to livestream.

While recording at the rally, the defendant commented, at 11:15:17 a.m., "We may get a tour of the Capitol building on the inside."  After the rally, the defendant returned briefly to his hotel, then left for the Capitol, commenting to a hotel employee as he exited at 12:51:37 p.m. that "I'm gonna be out there at the Capitol.  Gonna be crazy; yeah, they're gonna try and occupy it. We may get a inside tour if you know what I mean."

The defendant obtained a scooter to take him from the hotel to the Capitol.  As he rode towards the Capitol, the defendant made the following comments at the times indicated to pedestrians, others communicating with him remotely, and persons he encountered:

13:23:16 "The Capitol's goin'crazy now; they're already macin' and everything, yeah"

13:23:30 "Remember the old saying. One goes and gets hammered.  Ten go and a few make it.  And then a hundred go and they all make it.  Then it's on."

13:25:40 "Hey.  Capitol's going off right now. They're trying to push the fence down.  Patriots are trying to get in to the Capitol right now."

13:29:50 "They're still pushin' fences tryin' to get through"

13:29:53 "Y'all may get some selfies inside the Capitol; I want to see you where Pelosi stands"

13:30:29 "They're evacuating buildings now in the area by the Capitol 'cause a what's goin' on; yeah they think we're gonna come in which is what if what we should have done we should have gone two blocks south and put up a perimeter so then when they come outta the tunnels – grab'em."

13:34:43 "They're in my ear; they're trying to tear the fence down at the Capitol so get up there …   no it's on, they're already evacuating"

13:35 01 "They're flash-bangin' the crowd behind 'em too"

13:36:39 "Getting closer. They're escalating the violence.  Continue."

13:38:07 "I can hear police goin' nuts through the city.  There's just, uh, caravans of police sirens."

13:38:18 "Guys, you should get to the Capitol; they're breakin' through the fence." [said while passing other Trump supporters near the 1300 block of F street]

13:40:50 "I got my producer in my ear right now.  With their other streams right now.  They're doing the whole de-arresting, when they're pulling people back and then they pulled some of the fence down.  I heard that they're evacuating the Capitol now too." [comment to pedestrian]

13:55:09 "I hear flash-bangs."

13:55:28 "And careful when you get up there.  They're macin' people and everything up there.  The police, the police, the Capitol police.  Yeah, they're breaking through the fence; people are climbing the scaffolding.  My producers got our feeds up there.  Be careful up there."

13:58:59 The defendant tells an onlooker that according to his producers, they can hear the protesters outside from the debate floor.

At 14:00:13, the defendant approached the Capitol from the West, passing and recording fencing with signs stating, in red lettering against a white background, "Area Closed by Order of the United States Capitol Police."  He left his scooter near one such fence and continued towards

the Capitol. As the defendant moved through the Capitol grounds, heading south and ultimately to the building's East Front, he continued to make comments such as the following to remote listeners or members of the crowd:

> 14:01:48 "This could be it. 1776. Approaching the Capitol building right now." "We've got uh patriots climbing scaffolding, flash-bangs going off, crowds chantin' push forward uh it sounds like they're [having] the debate right now on the House floor and they can say that they hear the crowd on the inside of the House floor"
>
> 14:03:14 [Shouting at crowd on grounds]: "They can hear us inside! Keep it up!
>
> 14:03:59 [shouting] Hey my producer says they can hear us on the inside of House floor. They're having the debate right now. They can hear us. Yeah. Call me back. they can hear the crowd inside. Right now. No. Keep it up.
>
> 14:04:31 A rioter tells the defendant where barriers are breached; he responds "I think it's time for a tour of the inside of the Capitol; it's our building; yeah, let's take a look at it"

From the East front, the defendant taunted and interfered with members of the mainstream media; he continued to tell the crowd that their chants could be heard inside of the Capitol, mentioning "the House floor" specifically, and he expressed delight that certain members of the crowd brought pitchforks to the exterior of the Capitol.[2] He opined that "maybe we need a coup," regretted not bringing a gas mask, and further claimed that there was no such thing as an official press badge, and badges were "just so that you've identified yourself and if you don't get in with shit the cops are not supposed to pitch ya. But that's why I have things like this on my back …" He also stated, at 14:28:43:

> I think we need to show that a police line can get broken, right? Need to show that we can hold something the state does not want held, right? And that this is our place and then push it beyond that, y'know? Obviously the debate's going on; we're a country of law and order so you want to see how that plays out; we'll find out hopefully very shortly what happens, right? And then we'll adjust accordingly. I

---

[2] The pitchforks were not captured in the defendant's body-worn camera recordings, but do appear along with the defendant in cellular phone videos obtained from other charged defendants.

4

hope it goes well, it's decertified and Trump is you know obviously the winner as he should be and obviously is uh and uh, y'know, we go on.  But games are played; I hope people are prepared to show that we will not put up with it and everyone here has red revolutionary blood flowing through their veins so at any time y'know it takes one person to do one thing and everyone says OK this is it, so I'm sure there's plenty of those people in this crowd of patriots willing to do and I hope we all back 'em up and let it go; yup …

At 14:37:24, the defendant exclaimed: "We need to do some house cleaning!  Let us in!  Need to take some trash out!  Pitchforks to the front!  All pitchforks to the front!"  From approximately 14:37:24 until 15:14, no video was available from the defendant's camera.

U.S. Capitol surveillance footage shows the defendant approaching the building's East Front door (also referred to as the Columbus door) at 2:58 p.m. (the equivalent of 14:48).  Surveillance cameras recorded the defendant's entry into the Capitol building at approximately 2:59 p.m.  He progressed into the Rotunda, where Metropolitan Police body-worn camera recorded the defendant until at least 3:10 p.m.:



By approximately 3:12 p.m., the defendant had left the Rotunda and was making his way out of the Capitol building.

Upon exiting from the building, and as recorded on his own body-worn camera, the defendant took offense when another rioter accused him of being "fake news;" the defendant responded angrily, exclaiming at 15:14:31, "I'm real news; I was in the Capitol," and at 15:14:38, "I'm marching in here, I'm not supposed to be in here, I'm a patriot like you."[3] Over the next several minutes, the defendant addressed the crowd and announced, "Mission accomplished." From 15:17:18 until approximately 15:33, the defendant made the following statements:

> They could hear the crowd outside.  And so, because of safety concerns, because the crowd got so big, they evacuated everybody out of there and took 'em out the tunnels and then so they shut down.  They couldn't certify, they couldn't do anything.  So if our mission was to stop them scare them and get in there show it was our house, we pushed through.  Now the Capitol police are more concerned 'cause there has been some looting in there. Of all these beautiful people there's gonna be a couple of d***s that are gonna do some Capitol police jobs that, OK, technically, I think we did our jobs, right?  We went in there, shut them down, showed 'em who's who, police didn't want us in that building.  We are not to go inside.  I see us inside.
> 
> …
> 
> Mission accomplished.
> 
> Mission accomplished, Patriots.  Do you know what you did?  Do you know what you did? History has been made here today.  Simultaneously, you broke in through the front, and through the rear.  They could not stop you.  You occupied the building; you caused them to stop what they were doing; they had to evacuate; they couldn't complete their session.  Mission accomplished.  Excellent! Excellent!

The defendant remained in the Capitol grounds or its environs until well after dark and a 6:00 p.m. curfew. While in the Capitol grounds, the defendant taunted and threatened police officers.  He also harassed, interfered with, and threatened members of the press, at one point telling one individual in a press enclosure, "The time will come I will cut your neck and I will have

---

[3] Although the defendant in this statement claimed to be "real news," he never sought or received press credentials for the U.S. Capitol.  In addition to the defendant's remark noted above that there was no such thing as an official press badge, the defendant's body-worn camera recordings include statements that "press id's mean nothing" (14:33:30); "there is no such thing as a f***in press badge (16:15:37); and his own press pass "is bullshit" (16:39:18).

6

my way with you. I will have my way with you, little boy; I'll gas your little ass. Yeah, you ain't nothin'" (at 16:20:34). The defendant flew back to California on January 8, 2021.[4]

### B. Concealment of the Defendant's Location

On January 6, 2021, the defendant's cellular telephone registered on the cellular phone tower closest to the United States Capitol. Records for this phone identified AT&T as the service provider. Records from AT&T identified one of the defendant's limited liability companies as the subscriber and the defendant as the person to contact. The address associated with the AT&T account for the phone was the same as the address on file for the defendant with the California Department of Motor Vehicles. This common address was for a privately-owned California business named The Mail Room of Newport Beach that provides post office boxes, among other services.

On his application to rent a post office box from the Mail Room of Newport Beach, the defendant listed his address as the address for a United Parcel Service (UPS) store. The defendant had previously rented a mailbox from the UPS store. On his application to rent a post office box from the UPS store, the defendant listed an address for an Extended Stay America hotel three miles away. According to information provided by the hotel, no documents were on file to confirm that the defendant had stayed at there.[5]

In the aftermath of the January 6 attack, the FBI issued a public "Be On The Lookout" or BOLO notice for the defendant. In an apparent reaction, the defendant streamed remarks taunting

---

[4] The summary above does not include all of the defendant's conduct on January 6, 2021, and should not be viewed as a representation of all of the government's evidence in this case.

[5] The defendant's prior fraud conviction in the District of Arizona arose from conduct that included his periodic changing of Web sites, bank accounts, and business addresses to avoid detection by law enforcement. *United States v. Matthew Thomas Purse*, Case No. CR-08-1359-GMS, ECF 23:15, (D.Az. Feb. 26, 2009)(factual basis for change of plea).

7

the FBI, stating, "Oh God, the Feds are looking for me.  Well then, then if you can't find me, oh, what good are you? … I ain't f***in' scared, what the f*** are you gonna do? What the f*** are you gonna do? We're gonna get you with and scare ya and hit you, whatever.  Jury trial.  We're gonna lock up all your money; yeah, you can't.  My money can't be locked up.  The income source is, ah, I don't uh [statement cuts off].

After obtaining a cell-site warrant and conducting repeated physical surveillance, the FBI was able to locate and arrest the defendant on July 9, 2021 in the Central District of California.  Agents found him residing in a rented Irvine, California warehouse bay not intended for personal habitation; in fact, the terms of the lease for the bay precluded its use as a residence.

Following his arrest, the defendant advised the PreTrial Services Office for the Central District of California that he had lived in that state for the last five years.  He claimed to have an income of $20,000 per month, and represented that one of his companies had an estimated value of $9,000,000.  Information the defendant provided was partially verified by a cousin, who believed the defendant resided not in Irvine, California, where the warehouse bay was located, but instead in Newport Beach, the city where the defendant had his rented post office box. The California PreTrial Services report also stated that the defendant was associated with the alias name of "Matt Davis."

### C. Procedural Background

On June 28, 2021, the defendant was initially charged in a criminal complaint for: 1) entering and remaining in any restricted building or grounds without lawful authority to do so, in violation of 18 U.S.C. § 1752(a)(1); 2) disorderly and disruptive conduct in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(2);  3) disorderly conduct in a Capitol Building, in

violation of 40 U.S.C. § 5104(e)(2)(D), and 4) parading, demonstrating or picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G). ECF 2.

Federal agents arrested the defendant on July 9, 2021. ECF 6. On August 6, 2021, a grand jury returned a five-count indictment charging in Count One that the defendant attempted to and did obstruct, influence and impede an official proceeding in violation of 18 U.S.C. §§ 1512(c)(2); in Count Two that the defendant entered and remained in a restricted building and grounds, in violation of 18 U.S.C. § 1751(a)(1); in Count Three that the defendant engaged in disorderly and disruptive conduct in and within such proximity to a restricted building and grounds, in violation of 18 U.S.C. § 1752(a)(2); in Count Four that the defendant engaged in disorderly and disruptive conduct within the United States Capitol Grounds and any of the Capitol Buildings, in violation of 40 U.S.C. § 5104(e)(2)(D), and in Count Five that the defendant paraded, demonstrated, and picketed in any Capitol Building. ECF 9.

The Central District of California released the defendant on bond with conditions that included location monitoring and restriction of his travel to that district and the District of Columbia for court purposes only. ECF 27:2-4. On July 26, 2021, Magistrate Judge G. Michael Harvey set conditions of release for the defendant. ECF 8. These included a requirement for the defendant to submit to supervision by the Central District of California, to stay away from the District of Columbia, with limited exceptions, to continue with location monitoring, and to notify the Central District of California of any travel outside of that district. ECF 8:2-3.

The defendant now seeks to relocate from California to Idaho, and to change the district of his supervision from the Central District of California to the District of Idaho, where he reportedly plans to reside in an Extended Stay America hotel. As grounds for this change, the defendant claims that he seeks to relocate for business reasons, he has complied with his current release

9

conditions, and PreTrial Services has not objected to his request. The defendant has not, however, provided a sufficient legal basis for the relocation he requests, and apart from documenting a lack of objection from PreTrial Services, has not provided documentation with his motion for business or other reasons for his move. In light of the defendant's obscure living arrangements and the limited information provided in his motion, this Court should decline to grant the defendant's request.

## ARGUMENT

To support his relocation and the transfer of his supervision to another district, the defendant emphasizes the lack of objection to his transfer from California PreTrial Services officers. According to the PreTrial Services report from the Central District of California, its PreTrial Services officers considered what they believed to be the defendant's stable residence as one factor minimizing any risk of flight. Those officers, however, were apparently unaware that the defendant's residential history amounted to little more than a post office box; for years, the defendant's physical residence has remained unknown, unreported, and undocumented. Before his arrest, it appears that the only record of a physical address that the defendant disclosed was for an Extended Stay America hotel that had no records on file of his occupancy. Since it appears that the PreTrial Services office conducting the defendant's courtesy supervision did not have access to the defendant's long history without a verified physical address, or his unverified claims of occupancy at an extended stay hotel, the lack of objection to the defendant's requested return to an extended stay hotel should not receive great or any weight.[6]

---

[6] Even without considering the long absence of a documented physical address for the defendant, his supervising PreTrial Services officer recognized that his requested residence in a hotel could be cause for concern. *See* ECF 37-3 ("The District of Idaho may have issue with you residing in a hotel … They may see you as not having stable residence in Idaho and believe you could be transient or moving around").

The defendant's compliance with release conditions is also not a factor that supports modification of those conditions. *United States v. Henry*, 314 F.Supp.3d 130, 133 (D.D.C. 2018) (even model compliance does not warrant modification of such conditions); *see also United States v. Kube*, No. 1:19-cr-00257-NONE-SKO, 2020 WL 1984178 *5 (E.D. Cal. Apr. 27, 2020) ("It is presumed that the defendant will abide by the conditions imposed and his demonstrated ability to do so is what allows him to remain on pretrial release. The fact that Defendant has complied with his conditions of release is what allows him to remain out of custody and is not new information that has a material bearing on his conditions to reopen the detention hearing"); *United States v. Gay*, No. 4:20-cr-40026-JES-JES, 2020 WL 5983880 at *3 (C.D. Ill. Oct. 7, 2020) (same).

The inconvenience of release conditions for the defendant similarly does not provide an appropriate basis to modify conditions the Court imposed to secure his appearance in connection with a serious felony charge, among other offenses. The burden that any release condition or even pretrial detention places on a defendant is not a relevant factor under the Bail Reform Act, 18 U.S.C. § 3142 *et seq. See United States v. Lee*, 451 F.Supp.3d 1, 7 (D.D.C. 2020) (opinion by Ketanji Brown Jackson)("the relevant statutory inquiry is *not* the benefits the defendant's release would bring about (however significant) or the harms that his incarceration would cause (however substantial)) (original emphasis); *United States v. Peguero*, 2021 WL 4811315 at *3 (W.D. Ky. Oct. 14, 2021) (court's choice of least restrictive release conditions to ensure a defendant's appearance and protect the community do not focus on how such conditions impact the defendant; home detention making it difficult for defendant to schedule work assignments and bring parent to health care appointments did not support modification of release condition); *United States v. Gay*, No. 4:20-cr-40026-JES-JES, 2020 WL 5983880 at *3 (C.D. Ill. Oct. 7, 2020) (impact that release conditions cause for defendant is not sufficient cause for modifying conditions.

The defendant's motion provides almost no detail concerning the reasons for his requested relocation. An attachment to the motion, ECF 37-2, includes the defendant's request to move to Idaho for "work purposes" but does not state that he in fact has a job in or full-time employment in Idaho. The motion does not identify who the defendant will be working for; whether the "work purposes" concern a single project involving "the set-up and operation" of unspecified new technology, or whether his "work purposes" involve permanent employment. Somewhat implausibly, after claiming five years of residency in California to PreTrial Services at the time of his arrest, to secure his move to Idaho, the defendant claims now that he has "no ties to California, business or family/friends." Neither the motion or its attachments, however, assert that the defendant has ties to Idaho other than "work purposes" for an unnamed entity.

The defendant's desire to relocate to another jurisdiction for "work purposes" for an unnamed entity, with residence at an extended stay hotel, following a residential history of unknown stability without any documented physical address, merits concern. Moreover, the defendant's reasons for seeking to relocate do not involve relevant Bail Reform Act considerations. If anything, the defendant's motion has revealed that factors which seemed to weigh against viewing him as a flight risk (a stable residence, stable employment, community ties) are actually weaker than originally believed. Strong evidence supports the charges against the defendant, which include a serious felony offense that carries a 20-year maximum penalty and an estimated guideline range (absent any adjustment for acceptance of responsibility, *see* U.S.S.G. § 3E1.1) of incarceration for 30-37 months.

Accordingly, the defendant's release conditions should not be changed, and his motion should be denied.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052


 /s/ Karen Rochlin
KAREN ROCHLIN
DC Bar No. 394447
Assistant U. S. Attorney Detailee
U.S. Attorney's Office
Southern District of Florida
99 N.E. 4th Street
Miami, Florida  33132
(786) 972-9045
Karen.Rochlin@usdoj.gov

13