# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Case No. 1:21-cr-00512-PLF |
| MATTHEW THOMAS PURSE, | |
| Defendant. | |

## UNITED STATES' RESPONSE TO DEFENDANT PURSE'S MOTION
## TO MODIFY ORDER SETTING CONDITIONS OF RELEASE

The United States of America, through undersigned counsel, respectfully submits that defendant Matthew Thomas Purse's motion, ECF 60, seeking to modify the order setting conditions of his bond, should be denied. The defendant, an active participant in the riot at the United States Capitol on January 6, 2021 and a felon with two prior fraud convictions[1], engaged in significant efforts to conceal his location that included false claims of residence at an extended stay hotel. His history includes the use of alias names. He now renews his request for an order removing the requirement for location monitoring and allowing him to reside and receive pretrial supervision in Idaho, where he claims once again he will stay in an extended stay hotel. Certain details Purse provides in an attempt to support his motion have been refuted when law enforcement attempted to verify them, and appear to be false or misleading. For the reasons provided below, the United States is not prepared to agree to the relief the defendant requests.

---

[1] The defendant was convicted in *State of Arizona v. Matthew Thomas Purse*, Case No. CR2007-103670-001, for fraudulent scheme/artifices under Arizona Revised Statutes § 13-2310; on or about June 1, 2007, the defendant was sentenced to four months in jail and a three-year term of probation, with sentence conditions suspended. In *United States v. Matthew Thomas Purse*, Case No. 08-CR-1350-GMS (D. Arizona), the defendant was convicted of conspiracy, 18 U.S.C. § 371, one count of mail fraud, 18 U.S.C § 1341, and one count of criminal copyright infringement, 18 U.S.C. §§ 2319(b)(1) and 17 U.S.C. § 506(a)(1)(A), and on January 11, 2010, the court imposed a sentence of incarceration for 21 months.

## BACKGROUND

The charges against the defendant arise from his conduct during the attack on the United States Capitol on January 6, 2021. Before that date, the defendant purchased a body-worn camera and obtained false press credentials in the name of Mark Basingthwaite.

### A. The Defendant's Participation in the January 6, 2021 Attack on the U.S. Capitol

On January 5, 2021, defendant flew from California to Washington, D.C. to attend the Save America rally at the Ellipse on the morning of January 6. He checked into a hotel in the District of Columbia upon arrival. On the morning of January 6, the defendant dressed in black tactical apparel which included the word "PRESS" on a helmet and the front and back of a vest. He activated his personal body-worn camera which produced time-stamped recordings and kept that camera running for almost all of that day. The defendant attended the rally which he recorded and appeared to livestream.

While recording at the rally, the defendant commented, at 11:15:17 a.m., "We may get a tour of the Capitol building on the inside." When he left the rally, the defendant returned briefly to his hotel, then left for the Capitol, commenting to a hotel employee as he exited at 12:51:37 p.m. that "I'm gonna be out there at the Capitol. Gonna be crazy; yeah, they're gonna try and occupy it. We may get a inside tour if you know what I mean."

The defendant obtained a scooter to take him from the hotel to the Capitol. As he rode towards the Capitol, the defendant made the following comments at the times indicated to pedestrians, others communicating with him remotely, and persons he encountered:

> 13:23:16 "The Capitol's goin' crazy now; they're already macin' and everything, yeah"

> 13:23:30 "Remember the old saying. One goes and gets hammered. Ten go and a few make it. And then a hundred go and they all make it. Then it's on."

2

13:25:40 "Hey. Capitol's going off right now. They're trying to push the fence down. Patriots are trying to get in to the Capitol right now."

13:29:50 "They're still pushin' fences tryin' to get through"

13:29:53 "Y'all may get some selfies inside the Capitol; I want to see you where Pelosi stands"

13:30:29 "They're evacuating buildings now in the area by the Capitol 'cause a what's goin' on; yeah they think we're gonna come in which is what if what we should have done we should have gone two blocks south and put up a perimeter so then when they come outta the tunnels – grab'em."

13:34:43 "They're in my ear; they're trying to tear the fence down at the Capitol so get up there … no it's on, they're already evacuating"

13:35 01 "They're flash-bangin' the crowd behind 'em too"

13:36:39 "Getting closer. They're escalating the violence. Continue."

13:38:07 "I can hear police goin' nuts through the city. There's just, uh, caravans of police sirens."

13:38:18 "Guys, you should get to the Capitol; they're breakin' through the fence." [said while passing other Trump supporters near the 1300 block of F street]

13:40:50 "I got my producer in my ear right now. With their other streams right now. They're doing the whole de-arresting, when they're pulling people back and then they pulled some of the fence down. I heard that they're evacuating the Capitol now too." [comment to pedestrian]

13:55:09 "I hear flash-bangs."

13:55:28 "And careful when you get up there. They're macin' people and everything up there. The police, the police, the Capitol police. Yeah, they're breaking through the fence; people are climbing the scaffolding. My producers got our feeds up there. Be careful up there."

13:58:59 The defendant tells an onlooker that according to his producers, they can hear the protesters outside from the debate floor.

At 14:00:13, the defendant approached the Capitol from the West, passing and recording fencing with signs stating, in red lettering against a white background, "Area Closed by Order of

the United States Capitol Police Board" including signage in the following screenshots from the defendant's personal body-worn camera:



*Figure 1*



*Figure 2*

The defendant left his scooter near the area shown above in Figure 2 and continued towards the Capitol.  As the defendant moved through the Capitol grounds, heading south and ultimately to the building's East Front, he continued to make comments such as the following to remote listeners or members of the crowd:

> 14:01:48 "This could be it.  1776.  Approaching the Capitol building right now."
> "We've got uh patriots climbing scaffolding, flash-bangs going off, crowds chantin' push forward uh it sounds like they're [having] the debate right now on the House floor and they can say that they hear the crowd on the inside of the House floor"
>
> 14:03:14 [Shouting at crowd on grounds]: "They can hear us inside!  Keep it up!
>
> 14:03:59 [shouting] Hey my producer says they can hear us on the inside of House floor.  They're having the debate right now.  They can hear us.  Yeah.  Call me back.  They can hear the crowd inside.  Right now.  No.  Keep it up.
>
> 14:04:31 A rioter tells the defendant where barriers are breached; he responds "I think it's time for a tour of the inside of the Capitol; it's our building; yeah, let's take a look at it"

From the East front, the defendant taunted and interfered with members of the mainstream media; he continued to tell the crowd that their chants could be heard inside of the Capitol, mentioning "the House floor" specifically, and he expressed delight that certain members of the crowd brought pitchforks to the exterior of the Capitol.[2]  He opined that "maybe we need a coup," regretted not bringing a gas mask, claimed that there was no such thing as an official press badge, and that badges were "just so that you've identified yourself and if you don't get in with shit the cops are not supposed to pitch ya.  But that's why I have things like this on my back …"  He also stated, at 14:28:43:

> I think we need to show that a police line can get broken, right?  Need to show that we can hold something the state does not want held, right?  And that this is our place and then push it beyond that, y'know? Obviously the debate's going on; we're

---

[2] The pitchforks were not captured in the defendant's body-worn camera recordings, but do appear along with the defendant in cellular phone videos obtained from other charged defendants.

a country of law and order so you want to see how that plays out; we'll find out hopefully very shortly what happens, right? And then we'll adjust accordingly. I hope it goes well, it's decertified and Trump is you know obviously the winner as he should be and obviously is uh and uh, y'know, we go on. But games are played; I hope people are prepared to show that we will not put up with it and everyone here has red revolutionary blood flowing through their veins so at any time y'know it takes one person to do one thing and everyone says OK this is it, so I'm sure there's plenty of those people in this crowd of patriots willing to do and I hope we all back 'em up and let it go; yup …

At 14:37:24, the defendant exclaimed: "We need to do some house cleaning! Let us in! Need to take some trash out! Pitchforks to the front! All pitchforks to the front!" From approximately 14:37:24 until 15:14, no video was available from the defendant's camera.

U.S. Capitol surveillance footage shows the defendant approaching the building's East Front door (also referred to as the Columbus door) at 2:58 p.m. (the equivalent of 14:48). Surveillance cameras recorded the defendant's entry into the Capitol building at approximately 2:59 p.m. He progressed into the Rotunda, where Metropolitan Police body-worn camera recorded the defendant, indicated below with a red arrow, until at least 3:10 p.m.:



*Figure 3*

By approximately 3:12 p.m., the defendant had left the Rotunda and was making his way out of the Capitol building.

Upon exiting from the building, and as recorded on his own body-worn camera, the defendant took offense when another rioter accused him of being "fake news;" the defendant responded angrily, exclaiming at 15:14:31, "I'm real news; I was in the Capitol," and at 15:14:38, "I'm marching in here, I'm not supposed to be in here, I'm a patriot like you."[3]  Over the next several minutes, the defendant addressed the crowd and announced, "Mission accomplished." From 15:17:18 until approximately 15:33, the defendant made the following statements:

> They could hear the crowd outside.  And so, because of safety concerns, because the crowd got so big, they evacuated everybody out of there and took 'em out the tunnels and then so they shut down.  They couldn't certify, they couldn't do anything.  So if our mission was to stop them scare them and get in there show it was our house, we pushed through.  Now the Capitol police are more concerned 'cause there has been some looting in there. Of all these beautiful people there's gonna be a couple of d***s that are gonna do some Capitol police jobs that, OK, technically, I think we did our jobs, right?  We went in there, shut them down, showed 'em who's who, police didn't want us in that building.  We are not to go inside.  I see us inside.
>
> …
>
> Mission accomplished.
>
> Mission accomplished, Patriots.  Do you know what you did?  Do you know what you did? History has been made here today.  Simultaneously, you broke in through the front, and through the rear.  They could not stop you.  You occupied the building; you caused them to stop what they were doing; they had to evacuate; they couldn't complete their session.  Mission accomplished.  Excellent! Excellent!

The defendant remained in the Capitol grounds or its environs until well after dark and a 6:00 p.m. curfew. While in the Capitol grounds, the defendant taunted and threatened police

---

[3] Although the defendant in this statement claimed to be "real news," he never sought or received press credentials for the U.S. Capitol.  In addition to the defendant's remark noted above that there was no such thing as an official press badge, the defendant's body-worn camera recordings include statements that "press id's mean nothing" (14:33:30); "there is no such thing as a f***in press badge" (16:15:37); and his own press pass "is bullshit" (16:39:18).

officers.  He also harassed, interfered with, and threatened members of the press, at one point telling one individual in a press enclosure, "The time will come I will cut your neck and I will have my way with you.  I will have my way with you, little boy; I'll gas your little ass.  Yeah, you ain't nothin'" (at 16:20:34).  The defendant flew back to California on January 8, 2021.[4]

### B. Concealment of the Defendant's Location

On January 6, 2021, the defendant's cellular telephone registered on the cellular phone tower closest to the United States Capitol.  Records for this phone identified AT&T as the service provider.  Records from AT&T identified one of the defendant's limited liability companies as the subscriber and the defendant as the person to contact.  The address associated with the AT&T account for the phone was the same as the address on file for the defendant with the California Department of Motor Vehicles.  This common address was for a privately-owned California business named The Mail Room of Newport Beach that provides post office boxes, among other services.

On his application to rent a post office box from The Mail Room of Newport Beach, the defendant listed his address as the address for a United Parcel Service (UPS) store.  The defendant had previously rented a mailbox from the UPS store.  On his application to rent a post office box from the UPS store, the defendant listed an address for an Extended Stay America hotel three miles away.  According to information provided by the hotel, no documents were on file to confirm that the defendant had stayed there.[5]

---

[4] The summary above does not include all of the defendant's conduct on January 6, 2021, and should not be viewed as a representation of all of the government's evidence in this case.

[5] The defendant's prior fraud conviction in the District of Arizona arose from conduct that included his periodic changing of Web sites, bank accounts, and business addresses to avoid detection by law enforcement.  *United States v. Matthew Thomas Purse*, Case No. CR-08-1359-GMS, ECF 23:15, (D.Az. Feb. 26, 2009) (factual basis for change of plea).

In the aftermath of the January 6 attack, the FBI issued a public "Be On The Lookout" or BOLO notice for the defendant. In an apparent reaction, the defendant streamed remarks taunting the FBI, stating, "Oh God, the Feds are looking for me. Well then, then if you can't find me, oh, what good are you? … I ain't f***in' scared, what the f*** are you gonna do? What the f*** are you gonna do? We're gonna get you with and scare ya and hit you, whatever. Jury trial. We're gonna lock up all your money; yeah, you can't. My money can't be locked up. The income source is, ah, I don't uh [statement cuts off].

After obtaining a cell-site warrant and conducting repeated physical surveillance, the FBI was able to locate and arrest the defendant on July 9, 2021 in the Central District of California. Agents found him residing in a rented Irvine, California warehouse bay not intended for personal habitation; in fact, the terms of the lease for the bay precluded its use as a residence.

Following his arrest, the defendant advised the Pretrial Services Office for the Central District of California that he had lived in that state for the last five years. He claimed to have an income of $20,000 per month and represented that one of his companies had an estimated value of $9,000,000. Information the defendant provided was partially verified by a cousin, who believed the defendant resided not in Irvine, California, where the warehouse bay was located, but instead in Newport Beach, the city where the defendant had his rented post office box. The California Pretrial Services report also stated that the defendant was associated with the alias name of "Matt Davis."

### C. Procedural Background

On June 28, 2021, the defendant was initially charged in a criminal complaint for: 1) entering and remaining in any restricted building or grounds without lawful authority to do so, in violation of 18 U.S.C. § 1752(a)(1); 2) disorderly and disruptive conduct in a restricted building

or grounds, in violation of 18 U.S.C. § 1752(a)(2); 3) disorderly conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D), and 4) parading, demonstrating or picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G). ECF 2.

Federal agents arrested the defendant on July 9, 2021. ECF 6. The Central District of California released the defendant on bond with conditions that included location monitoring and restriction of his travel to that district and the District of Columbia for court purposes only. ECF 27:2-4. On July 26, 2021, Magistrate Judge G. Michael Harvey set conditions of release for the defendant. ECF 8. These included a requirement for the defendant to submit to supervision by the Central District of California; to stay away from the District of Columbia, with limited exceptions; to continue with location monitoring; and to notify the Central District of California of any travel outside of that district. ECF 8:2-3.

On August 6, 2021, a grand jury returned a five-count indictment charging in Count One that the defendant attempted to and did obstruct, influence and impede an official proceeding in violation of 18 U.S.C. §§ 1512(c)(2); in Count Two that the defendant entered and remained in a restricted building and grounds, in violation of 18 U.S.C. § 1751(a)(1); in Count Three that the defendant engaged in disorderly and disruptive conduct in and within such proximity to a restricted building and grounds, in violation of 18 U.S.C. § 1752(a)(2); in Count Four that the defendant engaged in disorderly and disruptive conduct within the United States Capitol Grounds and any of the Capitol Buildings, in violation of 40 U.S.C. § 5104(e)(2)(D), and in Count Five that the defendant paraded, demonstrated, and picketed in any Capitol Building. ECF 9.

On August 8, 2022, the defendant moved to modify his release conditions so that he could move from California to Idaho with courtesy supervision in Idaho. ECF 37. The United States opposed the motion after learning, among other reasons, that the defendant intended to reside in

an extended stay hotel when he had previously claimed residency at an extended stay hotel which the hotel was unable to document. ECF 38. The opposition also noted the defendant's criminal history, which included his conviction for charges involving conduct that included his periodic changing of Web sites, bank accounts, and business addresses to avoid detection by law enforcement, citing *United States v. Matthew Thomas Purse*, Case No. CR-08-1359-GMS, ECF 23:15, (D.Az. Feb. 26, 2009) (factual basis for change of plea). The opposition also described the difficulty law enforcement encountered trying to locate the defendant, the need to obtain a cell-site warrant in order to do so, the defendant's awareness that the FBI was looking for him, his broadcasted taunting of the agents looking for him, and the eventual location of the defendant where he lived in a commercial warehouse bay in violation of the lease conditions for that location. The opposition also expressed concern that while the defendant sought to relocate for his employment, his motion provided few if any details explaining what that employment involved or why moving to another jurisdiction was necessary.

This Court ordered the defendant to file a reply providing "more fulsome details of Mr. Purse's requested relocation." August 30, 2022 Minute Order. Instead of providing that detail, the defendant disputed this Court's determination of what was necessary to resolve his motion, arguing the details which the Court ordered him to provide were "extraneous," and "had no bearing" on his motion. ECF 40 at 2. This Court denied his motion. ECF 41.

The defendant has now moved again to modify his release conditions, adding removal of the requirement for location monitoring to his application and again seeking authorization to relocate to the District of Idaho. As grounds for this change, the defendant notes the Superseding Information's removal of the felony charge against him, claims that he wants to relocate for work-related reasons, and notes compliance with his current release conditions. The defendant has not,

11

however, provided a sufficient legal or factual basis for the relocation he requests, and apart from documenting a lack of objection from Pretrial Services, has not provided documentation with his motion for business or other reasons for his move. His reasons for modification remain unpersuasive for the reasons stated below.

## ARGUMENT

### A.  Purse Fails To Show A Meaningful Change In Circumstances

The defendant seeks to remove the requirement for location monitoring, among other reasons, because he no longer faces a felony charge. ECF 60 at 2, 7-8. The conditions he complains of, however, were imposed before the defendant was charged with a felony, first in California and then by a magistrate judge in this district. When a grand jury returned an indictment charging the defendant with a felony count under 18 U.S.C. § 1512(c)(2), the defendant's original release conditions remained unchanged; the prosecution did not seek more restrictive conditions in light of the more serious charge. A change in the charges against the defendant provides no logical support for modification of release conditions when that change merely returns the defendant to the same position he was in at the time when magistrate judges, one in the district of arrest and then one in this district, each imposed location monitoring over the defendant's objection.

Accordingly, the superseding information warrants no change in the defendant's release conditions. Although the defendant's case has returned to a posture where he faces only misdemeanors, those charges are not insubstantial. For example, if the defendant were to be convicted of only a single offense under 18 U.S.C. § 1752(a)(2), an estimate of his resulting sentencing guidelines range would encompass 8-14 months of incarceration, capped at the statute's

maximum of a year's incarceration.[6]  Moreover, because the allegations against Purse are no less serious than when his release conditions were set, the posture of his case provides no reason to reduce those conditions.

### B. Purse Has Made Claims That Are False Or Misleading

In his motion, Purse seeks modification of his release conditions because he is the Chief Operating Officer ("COO") of Disruptive Technologies, LLC which:

> has officially entered its operational phase, including mass production of its equipment by partner company AMFEC, located in Boise Idaho. Accordingly, Mr. Purse seeks to be on-site in Idaho, where the company's equipment is being manufactured, to effectively oversee manufacturing and assist with customer inspections, as remote work will not lend itself to effective management of these on-site operations.

ECF 60 at 5.  Purse further states that he will report to 4923 E. Linden Street, Caldwell, Idaho 83605 to oversee operations. *Id*. The address of 4923 E. Linden Street, Caldwell, Idaho 83605 is an address for AMFEC, as shown in Figure 4:

---

[6] In *United States v. Nassif*, 97 F.4th 968, 983, (D.C. Cir. 2024), *cert. denied*, ---S.Ct. ---, 2024 WL 4743113 (Nov. 12, 2024), the court of appeals held that U.S.S.G. § 2A2.4 is the appropriate guideline for a violation of 18 U.S.C. § 1752(a)(2).  That guideline provides for a base offense level of 10, while the defendant's criminal history category is estimated to be II, resulting in the instant estimate of an 8-14 month incarceration range.



*Figure 4: Screenshot showing address for AMFEC*

On November 25, 2024, an FBI special agent spoke with both the President and General Manager for AMFEC.  They advised that they have no knowledge of anyone named Matthew Purse.  They also stated that they were aware of a company called Disruptive Technologies because they had fulfilled an order for that company months ago; however, they have no ongoing relationship with that company.  Accordingly, there appears to be no reason for Purse to be present in Idaho for any reason having to do with AMFEC, and the information in his motion appears to be inaccurate.

Insofar as Purse is not providing accurate information, this Court has reason to deny his motion to remove conditions imposed to secure his appearance.  *See* 18 U.S.C. 3142(g)(3)(A) (directing consideration of the person's character when assessing whether release conditions can assure the person's appearance or the safety of the community); *United States v. Ali*, 793 F.Supp.2d 386, 390-91 (D.D.C. 2011) (defendant's past acts of deception supported presumption that the defendant was a flight risk) (citing *United States v. Khanu,* 370 Fed.Appx. 121, 122 (D.C. Cir. 2010)); *United States v. Vang*, 779 Fed.Appx. 426, 427 (8th Cir. 2019) (affirming defendant's

detention as a danger based on factors including his lack of candor during his interview with Pretrial Services); *United States v. Maxwell*, 510 F.Supp.3d 165, 175 (S.D.N.Y. 2020) (defendant's lack of candor to the court was a factor causing her history and characteristics to weigh in favor of continued detention and created "significant concerns … as to the defendant's willingness to abide by any set of conditions of release"); *United States v. Cincinelli*, No. 19-cr-0245 (JS), 2021 WL 2530711 at *2 (E.D.N.Y. June 18, 2021) (defendant's lack of candor towards presiding court and family court supported prior orders finding she was a danger to the community and that her release presented further risks of obstruction); *United States v. Ojo*, No. SAG-20-0369, 2020 WL 7707341 at *2 (D.Md. Dec. 29, 2020) ("A lack of candor with those who would be supervising his release conditions weighs heavily against [the defendant's] release"). At a minimum, Purse's lack of candor does not support relaxation of his release conditions. His claims of need to oversee manufacturing that, at best, has already occurred fails to warrant any accommodation from this Court.

Purse's earlier approach to litigation of his release conditions also provides grounds for concern with removal of his current conditions. His original motion for release based on a claimed need to relocate for his work provided minimal information about his work, and no documentation for any claim related to his occupation. *See* ECF 37. His response to this Court's order to provide further information is concerning. Rather than provide detail as ordered by this Court, his answer, instead, was to dispute the Court's order. His refusal to be forthcoming as well as his decision not to comply with a court order does not provide a history which suggests that in the absence of his current conditions he will comply with orders he dislikes. His withholding of information this Court ordered him to provide does not weigh in favor of removing any release condition.

### C. Businesses Associated With Purse Are Also Concerning

The pending motion appears to provide more detail than Purse's additional filing; however, further examination of the information Purse has offered raises more concerns than it alleviates. According to his motion, ECF 60 at 5, Purse is the Chief Operating Officer ("COO") for Disruptive Technologies LLC, with a corporate address of 3773 Howard Hughes Parkway, Suite 500S, Las Vegas, Nevada 89169. If allowed to relocate, Purse maintains he would report for work at 4923 E. Linden Street, Caldwell, Idaho, 83605 (the address for AMFEC), where he would be supervised by Courtney Porter. A search of publicly available online records, including records filed with various state divisions of corporations, has revealed no filing or open-source information identifying Purse as the COO, or as any officer or director, for an entity with the name "Disruptive Technologies."

Prior to his arrest for the charges in the instant case, Federal Bureau of Investigation ("FBI") agents observed Purse in Irvine, California entering a building with the name "Disruptive Technologies," shown in Figure 5, below.



*Figure 5: Surveillance Photo of Commercial Property Where Purse Was Observed*

Online records for the California Secretary of State include a July 1, 2019 initial filing for

Disruptive Technologies, Inc., a Delaware corporation that provided the following address for its

"Initial Street Address of Principal Executive Office - Do not enter a P.O Box" and "Street Address

of Principal Office in California, if any – Do not enter a P.O. Box": 220 Newport Center Drive,

Ste 11-153, Newport Beach, CA 92660. The filing was signed by Courtney Porter, representing that "I am a corporate officer and am authorized to sign on behalf of the corporation." *See* Figure 6, below.



*Figure 6: Screenshots of Statement and Designation by Foreign Corporation filed with California Secretary of State for Disruptive Technologies, Inc.; red box added*

Despite the filing instruction precluding use of a post office box or 'in care of' entity, the address provided was not the initial or any other street address for Disruptive Technologies. Instead, it was the address for The Mail Room of Newport Beach, a mailbox rental store. *See, e.g.,* Figure 6, below:

18



*Figure 7: Screenshot from online search for The Mail Room of Newport Beach* [7]

The address above for The Mail Room of Newport Beach, CA is the same address Purse provided to the California Department of Motor Vehicles for his residence, when in fact, he was residing in an Irvine, California warehouse bay in violation of the terms of his commercial lease.[8] An August 9, 2019 filing for Disruptive Technologies, Inc. again identified The Mail Room's address as the street address, mailing address, and address for service of process. This filing identified Courtney Porter as the Chief Executive Officer, Secretary, Chief Financial Officer, and agent for service of process for Disruptive Technologies.

Courtney Porter has also been associated with another company of Purse's called PAW Investments. PAW Investments was named in the 2008 fraud indictment against Purse as one of

---

[7] Information found at: https://www.google.com/search?q=%22The+Mail+Room%22+Newport+Beach%2C+CA (last checked November 24, 2024).

[8] Business records from The Mail Room of Newport Beach, CA document that Purse identified his address as a UPS store. Records from the UPS store show that Purse provided that business with the address for an Extended Stay Hotel that had no records he had stayed there.

the entities he used to commit mail and wire fraud and other offenses, and also in the statement of facts supporting his change of plea.  After Purse completed the term of incarceration imposed for this conviction, and three days after he began, on April 11, 2011, serving his term of supervised release, Courtney Porter, then known as Courtney Thompson, became, on April 14, 2011, a member of PAW Investments according to a filing with the Arizona Corporation Commission. According to that same filing, on November 10, 2011, PAW Investments was administratively dissolved "for having no valid known place of business address."

Disruptive Technologies, LLC, a Nevada Corporation, was registered with the State of Idaho on July 15, 2021.  The initial filing provides a Nevada address of 3773 Howard Hughes Parkway, 500S, Las Vegas, Nevada 89169.[9]  It also identifies C. Porter in the principal office address and mailing address, and names C. Porter as the registered agent.  Each reference to C. Porter includes the address of 5307 N. Glenwood Street, Garden City, Idaho 83714.  The filing identifies Phantom Technologies, Inc., also located at 3773 Howard Hughes Parkway, 500S, Las Vegas, Nevada 89169, as the Manager of Disruptive Technologies, LLC.  On February 27, 2003, C. Porter signed a filing reporting a change of address for Disruptive Technologies, LLC to a post office box, P.O. Box 911, Caldwell, Idaho.  Courtney Porter, signing as manager, also changed her address as registered agent to the same post office box.  On March 6, 2023, Courtney Porter signed a filing changing the registered agent to Incorp. Services, Inc., 1310 Buena Vista Avenue, Boise, Idaho 83705.

The Idaho Annual Reports for 2023 and 2024 again identified the manager of Disruptive Technologies, LLC as Phantom Technologies.  Filings with the Nevada Secretary of State have

---

[9] Information from the search portal linked to the Nevada Secretary of State website contains the entry "N/A" for the physical and mailing address of Disruptive Technologies, LLC's principal office.

also listed the address for Phantom Technologies' Manager as 220 Newport Center Drive, #11, Newport Beach, California, the same address for The Mail Room of Newport Beach, CA that Purse provided as his address to the California Department of Motor Vehicles.

Phantom Technologies has also registered with the Idaho Secretary of State, identifying the manager as Courtney Porter.   The address for Porter as Phantom Technologies' registered agent in Idaho is a post office pox located at P.O. 911, Caldwell Idaho or 3554 S. Crosspoint Avenue, Boise, Idaho 83706, a residential address, or 823 Arthur Street, also a residential address. Filings in 2023 have identified the principal office address for Phantom Technologies as 3554 S. Crosspoint Avenue, Boise, Idaho 83706, the same residential address.  The 2024 Annual Report for Phantom Technologies provides an address of 9169 W State Street PMB 889, Garden City, Idaho 83714, which is a post-office box.

What purports to be a news release for Disruptive Technologies, LLC identifies a website of disruptivetechnologies.global as a source for further information about the company. The site offers no information about company personal, the company's location, or any substantial information.  Nevada records for Disruptive Technologies Global, LLC identify the status of that company as "Permanently Revoked."



*Figure 8: Screenshot from Nevada business search portal showing permanently revoked status of Disruptive Technologies Global, LLC*

Available public records for Disruptive Technologies, LLC, Purse's purported employer, continue to provide grounds for concern. They show frequent use of post office boxes and list addresses that are residential. They show a complete absence of any reference to Purse, despite the statement in his motion that Purse is the company's COO. Only a single human officer of the company is identified, when the company's officer is not identified as another limited liability company. The only person identified as an officer has used the same mailbox rental store used by Purse as an address, and appears as a manager for one of the companies Purse used to commit fraud. These details are consistent with efforts to conceal location and association with the business where Purse claims he wishes to work. While Purse has chosen to document conversations with Pretrial Services officers (who work for the Court and can provide such information to the Court directly) he has provided no documentation for his employment. His motion does not warrant removal of location monitoring or a transfer to another jurisdiction where Purse again claims he will reside in an extended stay hotel.

In response to Purse's earlier motion to relocate to an extended stay hotel and work in Idaho, the United States noted that Purse's residential history amounted to little more than a post office box; for years, the defendant's physical residence had remained unknown, unreported, and undocumented. Before his arrest, it appears that the only record of a physical address that the defendant disclosed was for an Extended Stay America hotel that had no records on file for his occupancy. Since it appears that the Pretrial Services office conducting the defendant's courtesy supervision did not have access to the defendant's long history without a verified physical address,

or his unverified claims of occupancy at an extended stay hotel, the lack of objection to the defendant's requested return to an extended stay hotel should not receive great or any weight.[10]

With respect to the pending motion, corporate filings for or associated with Purse's employer seem uncomfortably close to the type of offense conduct associated with his prior Arizona conviction, and reflect several practices associated with concealment. Purse has a record of dishonesty and even his current charges involved the making and use of false credentials under an alias name. As Purse was aware, it was difficult for law enforcement to locate him, and the United States does not seek to reprise those efforts.

Finally, Purse's seeming compliance with release conditions is also not a factor that supports modification of his release conditions. *United States v. Henry*, 314 F.Supp.3d 130, 133 (D.D.C. 2018) (even model compliance does not warrant modification of such conditions); *see also United States v. Kube*, No. 1:19-cr-00257-NONE-SKO, 2020 WL 1984178 *5 (E.D. Cal. Apr. 27, 2020) ("It is presumed that the defendant will abide by the conditions imposed and his demonstrated ability to do so is what allows him to remain on pretrial release. The fact that Defendant has complied with his conditions of release is what allows him to remain out of custody and is not new information that has a material bearing on his conditions to reopen the detention hearing"); *United States v. Gay*, No. 4:20-cr-40026-JES-JES, 2020 WL 5983880 at *3 (C.D. Ill. Oct. 7, 2020) (same). The United States also respectfully suggests that disputing a Court order for disclosure, or alternatively, provision of misleading information to be used in a motion, is not the kind of "compliance" that favors the modification Purse demands.

---

[10] Even without considering the long absence of a documented physical address for the defendant, his supervising Pretrial Services officer recognized that his requested residence in a hotel could be cause for concern. *See* ECF 37-3 ("The District of Idaho may have issue with you residing in a hotel … They may see you as not having stable residence in Idaho and believe you could be transient or moving around").

The inconvenience of release conditions for a defendant similarly does not provide an appropriate basis to modify conditions the Court found appropriate to ensure appearance.  The burden that any release condition or even pretrial detention places on a defendant is not a relevant factor under the Bail Reform Act, 18 U.S.C. § 3142 *et seq. See United States v. Lee*, 451 F.Supp.3d 1, 7 (D.D.C. 2020) (opinion by Ketanji Brown Jackson)("the relevant statutory inquiry is *not* the benefits the defendant's release would bring about (however significant) or the harms that his incarceration would cause (however substantial)) (original emphasis); *United States v. Peguero*, 2021 WL 4811315 at *3 (W.D. Ky. Oct. 14, 2021) (court's choice of least restrictive release conditions to ensure a defendant's appearance and protect the community do not focus on how such conditions impact the defendant; home detention making it difficult for defendant to schedule work assignments and bring parent to health care appointments did not support modification of release condition); *United States v. Gay*, No. 4:20-cr-40026-JES-JES, 2020 WL 5983880 at *3 (C.D. Ill. Oct. 7, 2020) (impact that release conditions cause for defendant is not sufficient cause for modifying conditions.  Rejection of Purse's application to stay even temporarily in an extended stay hotel at most represents an inconvenience; such arrangements are not essential to relocation or arranging for a stable residence.

This Court previously considered and rejected Purse's request to relocate to Idaho.  To reopen that question, purse must present information exists that was not known to the movant at the time of the earlier hearing that has a material bearing on release conditions.  *See* 18 U.S.C. § 3142(f)(2); *Lee*, 451 F.Supp.3d at 5.  Even assuming some accuracy to Purse's claims, his association with Disruptive Technologies and any employment obligations for that company have been known to Purse before the filing of his motion.  They do not constitute new information that support reconsideration of his release conditions.

Purse's original motion revealed that factors which seemed to weigh against viewing him as a flight risk (a stable residence, stable employment, community ties) are actually weaker than originally believed.  Strong evidence supports the charges against him, which even without a felony charge can support a significant term of incarceration.

Accordingly, the defendant's release conditions, most especially the condition of location monitoring, should not be changed.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052


*/s/ Karen Rochlin*
KAREN ROCHLIN
DC Bar No. 394447
Assistant U. S. Attorney Detailee
U.S. Attorney's Office
Southern District of Florida
99 N.E. 4th Street
Miami, Florida  33132
(786) 972-9045
Karen.Rochlin@usdoj.gov